**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JACK LAVELTON NICHOLSON,

*Defendant-Appellant.*

No. 08-6347

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., Senior District Judge.
(2:01-cr-00041-HCM-1)

Argued: September 24, 2009

Decided: July 12, 2010

Before KING and DUNCAN, Circuit Judges,
and Irene M. KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge King
wrote the majority opinion, in which Judge Duncan joined.
Judge Keeley wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: Marvin David Miller, LAW OFFICE OF MARVIN D. MILLER, Alexandria, Virginia, for Appellant. James

Ashford Metcalfe, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF**: Heather Golias, LAW OFFICE OF MARVIN D. MILLER, Alexandria, Virginia, for Appellant. Dana J. Boente, Acting United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Jack Lavelton Nicholson has twice been denied 28 U.S.C. § 2255 habeas corpus relief in the Eastern District of Virginia — and has twice appealed — on his claim that he was deprived of his Sixth Amendment right to effective assistance of counsel because his lawyer had an actual conflict of interest. More specifically, Nicholson maintains that, during his sentencing proceedings on a federal firearm offense, his lawyer declined to move for a downward departure on the basis of self-defense necessity (a "self-defense departure") in order to avoid accusing another of the lawyer's clients of threatening Nicholson's life. In Nicholson's first appeal of the district court's denial of § 2255 relief, we reversed the court's ruling that there was no conflict of interest, and we remanded for a determination of whether the conflict adversely impacted the lawyer's performance during the sentencing proceedings. *See United States v. Nicholson*, 475 F.3d 241 (4th Cir. 2007) ("*Nicholson I*"). On remand, the court ruled that the conflict had not adversely affected the lawyer's performance and, thus, yet again deemed Nicholson's claim to be without merit. *See United States v. Nicholson*, No. 2:01-cr-00041 (E.D. Va. Feb. 7, 2008) (the "Remand Opinion").[1] In this second appeal, as explained below, we reverse the court's denial of § 2255 relief and remand for resentencing.

---

[1]The unpublished Remand Opinion is found at J.A. 757-97. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

## I.

### A.

On June 6, 2001, Nicholson pleaded guilty in the Eastern District of Virginia to the offense of possession of a firearm and ammunition by a felon, in contravention of 18 U.S.C. § 922(g)(1). At Nicholson's August 29, 2001 sentencing hearing, the district court determined that the applicable Sentencing Guidelines range was 168 to 210 months of imprisonment, but recognized that the statutory minimum sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), was 180 months.

Significantly, Nicholson's presentence investigation report (the "Nicholson PSR") reflected that, when the authorities found him in possession of the firearm and ammunition, "Nicholson advised that he possessed the firearm for his own personal protection." J.A. 858. Importantly, that Nicholson needed protection at the time of his arrest was acknowledged by the Government during both the sentencing hearing, *see id.* at 50 ("Quite frankly, when he was arrested, there were people out to kill him."), and the earlier plea colloquy, *see id.* at 30 ("He stated that he had the firearm for his personal protection [and] [i]t's certainly reasonable to believe that someone might try to injure him or shoot him."). During his allocution to the court at sentencing, Nicholson explained that "someone [had been] out to kill [him]" because his brother was a police informant, and that the person intending to kill him was responsible for the attempted murder of his brother and the murder of his step-father. *Id.* at 58. Nicholson then stated, "I was in fear for my life, so, yes, I possessed a gun, but it was only for my protection." *Id.*

Although it was broadly understood and accepted that Nicholson had legitimate reason to fear for his life when the authorities found him in possession of the firearm, his lawyer, Jon Babineau, failed to move for a self-defense departure.

Rather, Babineau sought only a downward departure on the ground that Nicholson suffered from a serious health condition, namely sickle cell anemia. The district court rejected this departure request and sentenced Nicholson to 189 months of imprisonment — nine months more than the statutory minimum. On direct appeal, Nicholson challenged the court's denial of his request for a health-related departure, but we affirmed. *See United States v. Nicholson*, 36 F. App'x 151 (4th Cir. 2002).

Thereafter, on June 6, 2003, Nicholson filed his 28 U.S.C. § 2255 motion, raising several ineffective assistance claims, including the claim that Babineau had an actual conflict of interest that adversely affected his performance during the sentencing proceedings. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.").[2] Nicholson's actual conflict of interest claim was based on his postsentencing discovery that, at the same time Babineau was representing Nicholson in connection with his federal firearm offense, Babineau was also representing Lorenzo Butts, a major drug

---

[2]In *Nicholson I*, we described *Sullivan* as requiring the petitioner to show "(1) that his lawyer was under 'an actual conflict of interest' and (2) that this conflict 'adversely affected his lawyer's performance.'" *Nicholson I*, 475 F.3d at 249 (quoting *Sullivan*, 446 U.S. at 348). In so doing, we followed a longstanding practice of our Court. *See, e.g.*, *Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001) (en banc) (delineating same two-part test), *aff'd*, 535 U.S. 162 (2002). In the Supreme Court's *Mickens* decision, however, the Court clarified that "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." 535 U.S. at 172 n.5. Thus, we now describe and apply *Sullivan* as requiring the petitioner to show, in order to prevail on an actual conflict of interest claim, that (1) petitioner's lawyer operated under a "conflict of interest" and (2) such conflict "adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348.

dealer and the very person who had threatened Nicholson's life and was intent on killing him. On October 15, 2003, the district court denied § 2255 relief without conducting a hearing. *See United States v. Nicholson*, No. 2:01-cr-00041 (E.D. Va. Oct. 15, 2003) (the "First Opinion").[3] In assessing the actual conflict claim, the court concluded that Babineau did not have a conflict of interest. Thus, the court did not address whether any conflict had adversely affected Babineau's performance during Nicholson's sentencing proceedings.

## B.

Nicholson appealed from the First Opinion's denial of § 2255 relief and, on November 10, 2004, we granted Nicholson a certificate of appealability ("COA") on a single issue: "Did an actual conflict of interest cause his counsel to render constitutionally ineffective assistance when he failed to move for a downward departure?" *See Nicholson I*, 475 F.3d at 244 (internal quotation marks and alteration omitted).[4] In our subsequent *Nicholson I* decision of February 2, 2007, we summarized the conflict claim as follows:

> Nicholson asserts that his lawyer was operating under an actual conflict of interest at his August 29, 2001 sentencing hearing because, at that time, Nicholson's lawyer, Jon Babineau, was representing Nicholson as well as another client, Lorenzo Butts. Butts had previously threatened to kill Nicholson and his family, had attempted to kill Nicholson's brother, and had already killed Nicholson's step-

---

[3]The unpublished First Opinion of the district court is found at pages 256-71 of the Joint Appendix filed by the parties in the *Nicholson I* appeal (No. 04-6092).

[4]A § 2255 petitioner is not entitled to pursue an appeal from the denial of relief unless he has been granted a COA. *See* 28 U.S.C. § 2253(c)(1)(B). In order to obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

father. Nicholson, who was convicted of a federal offense for his possession of a firearm and ammunition by a felon, asserts that he carried the handgun to protect himself from Butts. Nicholson maintains that Babineau, during the sentencing proceedings, failed to request a downward departure based on Nicholson's need to carry the handgun because, in so doing, Babineau would have accused his other client (Butts) of uncharged criminal conduct. Nicholson asserts that an actual conflict of interest thus existed, and that it adversely affected the performance of his lawyer during the sentencing proceedings, in contravention of his Sixth Amendment right to the effective assistance of counsel.

*Id.* Because the district court had considered affidavits and other materials submitted by the parties — but had not conducted an evidentiary hearing — we characterized the court's ruling in the First Opinion as akin to a summary judgment award to the Government and, thus, viewed the facts in the light most favorable to Nicholson. *See id.* at 248.

In assessing Nicholson's actual conflict of interest claim, we first concluded that, "[c]ontrary to the district court's ruling," lawyer Babineau's simultaneous representation of Nicholson and Butts created a conflict of interest. *Nicholson I*, 475 F.3d at 249. We explained, in short, that "Nicholson's interests, on the one hand, and Butts's interests, on the other, were in total opposition to each other during Babineau's simultaneous representation of them." *Id.* at 249-50. This simultaneous representation placed Babineau "in the position of having to make claims against Butts in order to pursue a downward departure motion, on the basis of self-defense necessity, in Nicholson's sentencing hearing." *Id.* at 251. Because Babineau was "in the untenable position of having to place the interests of one client (either Butts or Nicholson) above another (either Nicholson or Butts)," Babineau was impaired by a conflict of interest during Nicholson's sentenc-

ing proceedings. *Id.* Accordingly, we reversed the district court's ruling that a conflict of interest did not exist. *Id.* at 252.

On the issue of whether Babineau's conflict adversely affected his performance in Nicholson's sentencing proceedings, we observed that a § 2255 petitioner must satisfy, by a preponderance of the evidence, the three-part standard established in *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd without consideration of this point*, 535 U.S. 162 (2002). *See Nicholson I*, 475 F.3d at 251-52. More specifically, we explained:

> He must, first of all, "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued." [*Mickens*, 240 F.3d at 361]. Second, he must establish that "the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." *Id.* In order to satisfy this second prong, "the petitioner must show that the alternative strategy or tactic was 'clearly suggested by the circumstances.'" *Id.* (quoting [*United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991))]. Lastly, he must show that "the defense counsel's failure to pursue that strategy or tactic was linked to the . . . conflict." *Id.* In establishing these three aspects of this test, the petitioner is not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable. *See id.*

*Nicholson I*, 475 F.3d at 252. We also observed that "'much of the adverse effect inquiry is heavily fact dependent,'" and that we generally must "defer to a habeas court's findings of fact." *Id.* (quoting *Mickens*, 240 F.3d at 360). We further recognized, however, that the district court here "did not conduct a hearing and resolve the disputed factual contentions," nor

did it "reach and address whether Babineau's conflict adversely affected his performance in Nicholson's sentencing proceedings." *Id.* As such, we deemed ourselves "obliged to remand for a determination and assessment of the relevant facts" on the adverse effect issue. *Id.*[5]

### C.

### 1.

At the time of the First Opinion, the evidence before the district court included affidavits executed by Nicholson, several of his family members, and lawyer Babineau, as well as police and court documents related to Nicholson, Butts, and Babineau's simultaneous representation of these two clients.[6] The evidence reflected that, on January 7, 2001, Nicholson was arrested in Portsmouth, Virginia, on a state charge of possession of a firearm by a felon, immediately after city police officers found a handgun on Nicholson's person. At the time

---

[5]Notably, in *Nicholson I*, we rejected the Government's contention "that there was no adverse impact on Nicholson because it was not objectively reasonable for Babineau to move for a downward departure, as Nicholson's minimum Guidelines sentence was already lower than the statutory minimum." *Nicholson I*, 475 F.3d at 251 n.12. We explained that Nicholson

> was required to move for a downward departure prior to the court's final sentencing decision and, at that time, the Nicholson PSR's recommendation was merely that — a recommendation. Furthermore, Babineau actually moved for a downward departure based on another theory (Nicholson's health situation). Although a motion for a downward departure on self-defense necessity may have proven futile, the advancement of that theory, along with the presentation of supporting evidence, may have convinced the court to sentence Nicholson to the statutory minimum instead of, as imposed, nine months above the minimum.

*Id.*

[6]Our account herein of the evidence before the district court at the time of the First Opinion is largely drawn from the more detailed account in *Nicholson I*. *See* 475 F.3d at 244-47.

of his arrest, Nicholson stated to the authorities that, because he feared Butts and his associates, he had obtained the hand-gun for his personal protection.

Nicholson's statements indicated that this fear arose after his brother, Rudolph Nicholson, agreed in early 2000 to assist federal officers in their criminal investigation of Butts and his associates — prompting Butts to issue a series of threats against Rudolph and other Nicholson family members.[7] On March 3, 2000, brother Rudolph was shot seven times by Butts's son in Portsmouth, but survived the attack. Rudolph was treated for two months in a Norfolk, Virginia hospital, where a would-be assassin disguised as a priest — actually Butts himself — unsuccessfully attempted to enter Rudolph's room and kill him. Around May 2000, federal officers informed Nicholson and his mother, Sandra Nicholson (whom Butts also threatened), that Butts had placed a contract on Nicholson's life. On September 18, 2000, Nicholson's step-father, Charles Nicholson, was fatally shot multiple times on a Portsmouth street by Butts and his accomplices.

Following the murder of his step-father, Nicholson obtained a handgun from a friend and left Portsmouth to stay with his cousin in the Washington, D.C. area. When Nichol-son first came into possession of the handgun, it did not work, and he left it at a gun shop in Chesapeake, Virginia (near Portsmouth), to be repaired. On January 6, 2001, during a visit to Portsmouth, Nicholson retrieved the handgun from the gun shop. The following day, he was arrested with the hand-gun and charged by the Commonwealth with a state firearm offense.

Lawyer Babineau was retained to represent Nicholson on

---

[7]We refer herein to the appellant as "Nicholson"; to his brother (actually his half-brother) as "Rudolph Nicholson" or "Rudolph"; to their mother as "Sandra Nicholson" or "Sandra"; and to Nicholson's step-father (Rudolph's father) as "Charles Nicholson" or "Charles."

the state firearm charge, which was eventually dropped and replaced by the federal charge under 18 U.S.C. § 922(g)(1). Babineau's representation of Nicholson continued over to the federal charge. Nicholson was indicted by the federal grand jury on March 23, 2001, two months after his state arrest, and he was taken into federal custody on April 3, 2001. Shortly thereafter, on May 29, 2001, Babineau publicly debuted as Butts's counsel, appearing for Butts at a preliminary hearing conducted in a Virginia state court in Portsmouth on conspiracy, murder, and firearms charges. Both prior to and during the time Babineau was representing Butts in these state proceedings, Babineau was also representing and advising Nicholson on whether he should accept a proposed plea agreement from the United States Attorney on Nicholson's federal charge. Babineau never informed Nicholson that he was simultaneously representing Butts on state criminal charges, nor did Babineau seek Nicholson's consent to represent Butts during the same time frame.

According to their affidavits, Nicholson and his mother both had repeatedly advised Babineau — during his representation of Nicholson — that Nicholson possessed the handgun for protection from Butts. They had also explained to Babineau the source of Nicholson's fear: that Butts had placed a contract on Nicholson's life and had already killed Charles Nicholson, threatened Sandra Nicholson, and attempted to kill Rudolph Nicholson. Babineau averred in his affidavit, however, that Nicholson had advised that "his possession of a firearm was not one out of fear of anyone in particular, including Butts, but that he carried a firearm because of the activity that he was involved in, which created dangerous situations." J.A. 164. Babineau further averred that Sandra never mentioned Butts or his threats, and spoke with Babineau only about an effort to obtain a downward sentencing departure for Nicholson premised on his substantial assistance to law enforcement. In any event, during discovery in the federal prosecution of Nicholson, Babineau received written police reports reflecting statements made by Nicholson

regarding his possession of the handgun. In these statements to state and federal officers, Nicholson specified that he had carried the handgun for protection against Butts and his associates, but that he did not have any information regarding Butts and was not even sure what Butts looked like.

On June 6, 2001, Nicholson — represented by lawyer Babineau — pleaded guilty to the federal firearm offense. During the plea colloquy, the Government acknowledged to the district court that it was reasonable to believe that someone might try to injure or shoot Nicholson. Two weeks later, on June 22, 2001, in ongoing federal criminal proceedings against Butts in the Eastern District of Virginia (separate from his state proceedings), Butts notified the court that he would be represented at sentencing by Babineau.[8] As such, Babineau then received a presentence investigation report on Butts (the "Butts PSR"), which contained information implicating Butts in both Rudolph Nicholson's shooting and Charles Nicholson's murder. The Butts PSR also stated that Butts's "hit list" included Nicholson.[9] On July 23, 2001, the Nicholson PSR was issued, and it pointed out that Nicholson had advised the authorities that he carried the handgun for protection because he feared an individual who was trying to harm him. The next

---

[8]On April 30, 2001, a federal jury had found Butts guilty of multiple federal crimes, including conspiracy, drug distribution, and firearm offenses.

[9]The Butts PSR, provided to Babineau in June or July 2001, reflected the following: in March 2000, Butts's son shot "Unindicted Co-conspirator #7" (Rudolph Nicholson) and was subsequently scolded by Butts "for not shooting [Rudolph] in the head as he had been instructed"; after Butts's son was shot and killed in September 2000, "Butts made an oral 'hit list' of people he intended to have killed," including Charles Nicholson, Rudolph Nicholson, and appellant Jack Nicholson (misidentified in the Butts PSR as "Jake Nicholson"); and, shortly after Charles Nicholson's murder later in September 2000, Butts admitted that "he and several other individuals" driving together from Norfolk to Portsmouth had spotted Charles standing alone on a Portsmouth street corner, "circled the block, then exited the vehicle and fired on [Charles], who died as a result of the gunshot wounds." J.A. 912.

day, July 24, 2001, Babineau served as Butts's lawyer at sentencing in his federal proceedings, during which the court adopted the Butts PSR. Babineau also represented Butts on his appeal to this Court, which was filed on July 31, 2001. As part of that appeal, Babineau maintained, inter alia, that the trial court had erred by admitting evidence of Butts's prior bad acts, including the attempted murder of Nicholson's brother Rudolph and the murder of his step-father Charles. On August 20, 2001, the Government responded to the Nicholson PSR, stating that it had no objection to the facts set forth therein (including Nicholson's claim that he carried the handgun for self-protection). A week later, during Nicholson's August 29, 2001 sentencing hearing, the Government again confirmed to the court that certain individuals were trying to kill Nicholson at the time of his arrest. Babineau, however, in his representation of Nicholson, failed to address any of the circumstances surrounding Nicholson's firearm possession or to request a self-defense departure.

2.

On remand from our *Nicholson I* decision, the parties engaged in discovery and the district court conducted a January 30, 2008 evidentiary hearing. The evidence adduced on remand included testimony taken at depositions and during the hearing.

a.

During his videotaped deposition of September 4, 2007, Nicholson testified about his brother Rudolph Nicholson's cooperation with the authorities in their investigation of Butts and his associates; the threats made by Butts against Rudolph and other Nicholson family members; the shooting of Rudolph in March 2000; the federal agents' disclosure to Nicholson in May 2000 that he was on Butts's "hit list" and that his "life was in danger," J.A. 351-52; and the murder of his step-father Charles Nicholson in September 2000. Accord-

ing to Nicholson, a friend offered him a handgun after learning of Charles's murder, which had occurred earlier that same day. Nicholson accepted the handgun, which was not in working condition. On the day of Charles's funeral, Nicholson took the handgun to a Chesapeake gun shop called Chesapeake Gun Works to be repaired, and then left to stay with his cousin in the Washington, D.C. area. While there, Nicholson learned that Butts had been arrested by federal authorities, but Nicholson remained fearful of Butts because "he had people do his work for him." J.A. 358.

Nicholson further testified that, while living in the Washington, D.C. area, he periodically visited Portsmouth to meet with his probation officer and returned home for Christmas. Beginning on December 26, 2000, he was hospitalized for several days because of his sickle cell anemia. Upon his release in early January 2001, Nicholson stayed with his mother at her house in Portsmouth. Around that time, Nicholson heard "street rumors" that Butts's associates were "still looking for [him]" and that there "was a cash reward for [his] whereabouts." J.A. 362. On January 6, 2001, Nicholson went to Chesapeake Gun Works to pick up the now-repaired handgun and purchase a box of ammunition. The next day, January 7, 2001, Portsmouth police officers found Nicholson with the handgun and arrested him.

Babineau was retained to represent Nicholson on both the initial state charge and the replacement federal charge. Prior to his plea, Nicholson pushed for Babineau to move to suppress the firearm, as well as to assert justification as a complete defense to the 18 U.S.C. § 922(g)(1) offense, but Babineau pursued neither of those tactics. Nicholson testified that he subsequently learned from the probation officer who prepared the Nicholson PSR that he might be eligible for a self-defense departure at sentencing. Nicholson then urged Babineau to seek such a reduction, but Babineau advised that, in the words of Nicholson, "he couldn't find [any] Fourth Cir-

cuit case that dealt with that so it wouldn't apply." J.A. 436.[10]
Nicholson reiterated that lawyer Babineau never disclosed his
simultaneous representation of Butts, even though Babineau
knew of Butts's threats against Nicholson and Nicholson's
claim that he possessed the firearm for protection from Butts.

Additionally, Nicholson averred that he had never dis-
cussed his criminal history with Babineau. Nicholson

---

[10]Nicholson's testimony that he urged Babineau to move for a self-
defense departure is corroborated by two letters that were made part of the
record on remand. In the first of these letters, dated July 9, 2001 (during
the period between Nicholson's guilty plea and sentencing), Nicholson
requested Babineau to "check on if [it's] possible to get a downward
departure for instance when the defendant is a victim. The P.O. [probation
officer] was telling me something to that effect and he would check into
it." J.A. 470. In the second letter, which is undated, Nicholson wrote to
Babineau:

> I have a copy of a newspaper article that I would like you to
> check out. I'm hoping this can help me out. I really think we need
> to let the courts know that it was more of a self defense case than
> anything . . . . For real[,] Mr. Babineau, I wasn't out there run-
> ning wild in the streets with a gun just for the hell of it. I mean
> I just got the gun the day before which the ATF knows this
> because they went to the gun shop where I got it fixed. It been
> there like 3 months during the time I left the area to get away. I
> came back Dec. 23rd[,] went in the hospital Dec. 26th[,] [and]
> got discharged Jan. 2nd[.] I decided I was gonna stay home to be
> close to my girlfriend while she was pregnant so I went and got
> [the gun] because of the things that was going on with my
> brother.
>
> I know we been through this before but I really think this needs
> to be brought up especially with what is being said in the article
> [that's] included.

*Id.* at 471. Nicholson enclosed a newspaper article reporting a recent deci-
sion of the Virginia Court of Appeals authorizing juries to "consider
whether a felon was justified in using a weapon in self-defense." *Id.* at
472. Nicholson wrote on the copy of the article: "I had an actual contract
out on me! Please help me[.] [T]here [has] got to be some kind of justice
for me. I'm not saying I should go free but I'm saying I [don't] deserve
16 years for protecting myself and my family!!!" *Id.*

acknowledged that he had prior convictions on various felony offenses, each of which involved either firearms or controlled substances, but not both. This testimony is consistent with the Nicholson PSR, which reflected that, in April 1991 (at age seventeen), Nicholson fired a .38 caliber revolver at a group of people standing outside a Portsmouth fast food restaurant; in November 1991 (at age eighteen), he was found by police officers with 1.44 grams of cocaine base ("crack") in a Portsmouth housing project; and, in December 1991 (also at age eighteen), he shot into an occupied vehicle in Portsmouth. Nicholson was separately convicted and sentenced on state charges arising from each of these three incidents, and he was incarcerated in a state prison until March 1999. While incarcerated, Nicholson was found with marijuana in May 1997 and heroin in October 1997; he was convicted in January 1998 on two state drug possession charges and given two suspended sentences. These were his most recent offenses (other than an October 2000 driving offense) at the time he was arrested with the handgun on January 7, 2001. Nicholson disclaimed carrying or possessing any other firearm between his March 1999 release from state prison and his September 2000 receipt of the handgun from a friend on the day of his stepfather Charles Nicholson's murder.

b.

Two agents of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"), John Underwood and Marvin Logwood, testified at the January 30, 2008 evidentiary hearing at the Government's behest. ATF Agent Underwood had interviewed Nicholson on the day of his January 7, 2001 arrest, after Nicholson gave statements to the two Portsmouth police officers who had arrested him. In his statements to Agent Underwood and the Portsmouth officers, Nicholson consistently maintained that he possessed the handgun, a nine-millimeter semi-automatic pistol, for protection from Butts. Nicholson explained that Butts had placed a "hit" on him because of brother Rudolph Nicholson's cooperation with

the authorities, and also because Butts apparently believed — incorrectly — that Nicholson himself was involved in the recent murder of Butts's son, Vito Butts (who had previously shot Rudolph).

In an effort to provide Nicholson an opportunity to render substantial assistance to the Government and thereby obtain relief under the Sentencing Guidelines, Babineau arranged (but did not attend) another interview of Nicholson by ATF Agent Underwood. *See* USSG § 5K1.1 (2000) (authorizing court to grant downward departure, upon Government's motion, where defendant provides substantial assistance in investigation or prosecution of another person). This interview was conducted on April 12, 2001, prior to Nicholson's sentencing, in a Chesapeake hospital where Nicholson was being treated for sickle cell anemia. Agent Underwood described the interview as an "off the record" proffer during which Nicholson was to provide information to the Government about Butts. According to Underwood's written notes of the interview, Nicholson stated that Butts had paid Rudolph Nicholson three separate times "not to come to court," giving the money to Charles Nicholson "as a go between." J.A. 507. Nicholson spoke with Charles the morning of Charles's murder and asked him to tell Butts that Nicholson "didn't have anything to do with Vito's murder." *Id.* Charles responded that Butts "was crazy and wouldn't listen." *Id.* The day after Charles's murder, Nicholson "rented a minivan and drove around for a couple days thinking about revenge," but he did not act because he "didn't have anything" with which to exact revenge on Butts. *Id.* at 508.[11] Nicholson then left Portsmouth to "hide out" in the Washington, D.C. area. *Id.* Sometime before Christmas of 2000, after Butts had been arrested, Nicholson's grandmother urged him to return to Portsmouth

---

[11]Testifying during the evidentiary hearing, Agent Underwood clarified that when Nicholson stated he "didn't have anything," he was referring to the fact that the firearm he had obtained immediately following Charles Nicholson's murder "did not work." J.A. 633.

because he ran the risk of parole violations and "had a baby on the way." *Id.* Nicholson did not provide any other information concerning Butts during the April 12, 2001 interview. Thereafter, according to Agent Underwood's evidentiary hearing testimony, Underwood concluded that Nicholson "had no use in the trial against Mr. Butts." *Id.* at 632.

During the April 12, 2001 interview by ATF Agent Underwood, Nicholson revealed information about his own drug dealing and other persons involved therein. Agent Underwood testified that Nicholson admitted during the interview that he dealt drugs from "the early '90s, 1990 through I guess the point where he was arrested" on January 7, 2001. J.A. 631. Underwood acknowledged on cross-examination, however, that neither Nicholson nor his companion at the time of the January 7, 2001 arrest possessed any drugs, drug paraphernalia, or other indicia of drug dealing, such as large sums of cash. *See id.* at 635. Underwood also acknowledged that, by the time of Nicholson's 2001 arrest on the firearm charge, "law enforcement knew about Mr. Butts and his [well-deserved] reputation . . . for being violent and dangerous," and also knew that Butts "had plenty of associates out there" and that not "everybody that he knew or had ever done any criminal work for him" was (like Butts and many of his known associates) then incarcerated. *Id.* at 636.[12] Additionally, Underwood testified that, other than the handgun with which Nicholson was arrested, he knew "of no other guns" in Nicholson's possession during the same general time period (approximately spanning from Charles Nicholson's murder in September 2000 to Nicholson's arrest on the replacement federal charge in April 2001). *Id.* at 639.

---

[12]Notably, Agent Underwood's testimony about Butts's known dangerousness prompted the Government to assert during the hearing that it was "not saying that [Nicholson] had no reason to believe that other henchmen out there on the street would be a danger to him. We have never taken that position." J.A. 636-37.

Following his August 29, 2001 sentencing hearing, Nichol-son submitted to another interview with a federal agent, this time in an effort to obtain sentencing relief under Federal Rule of Criminal Procedure 35(b). *See* Fed. R. Crim. P. 35(b)(1), (4) (authorizing court, upon Government's motion made within one year of sentencing, to reduce sentence below statutory minimum if defendant, "after sentencing, provided substantial assistance in investigating or prosecuting another person"). This interview was conducted on September 4, 2001, by ATF Agent Logwood. During his interview with Agent Logwood, Nicholson again provided information about Butts, as well as information about his own drug dealing, which Nicholson admitted began when he was a teenager and continued through the time of his arrest in April 2001 on the replacement federal charge. Logwood testified at the evidenti-ary hearing about his conclusion that, although Nicholson was "truthful," there was nothing "new" in his information "that led to furtherance of [the Butts] investigation." J.A. 650. Log-wood also acknowledged on cross-examination Butts's repu-tation "in law enforcement and in the community" for being "a violent, dangerous, murderous character," *id.* at 648, and the absence of evidence that Nicholson possessed any firearm — other than the handgun with which he was arrested on Jan-uary 7, 2001 — between his release from state prison in 1999 and his federal arrest in April 2001.

c.

Lawyer Babineau testified in an August 9, 2007 deposition and at the January 30, 2008 evidentiary hearing. During the deposition, Babineau averred that he had discussed with Nich-olson — prior to Nicholson's guilty plea — the possibility of raising justification as a complete defense to Nicholson's fed-eral charge under 18 U.S.C. § 922(g)(1). In this regard, Babineau testified that he "told [Nicholson] a number of things, and one of them was . . . that the [complete justifica-tion defense,] in order to be deemed to be credible, or believed by a jury, was going to [require Nicholson] to take

the stand and testify" — exposing Nicholson to cross-examination about his criminal record and "other statements that would be attributed to him." J.A. 246. Babineau further testified that,

> [s]econdly, and very importantly, is that I was not going to suborn perjury for Jack Nicholson. Jack Nicholson had told me that he was not afraid of Butts. That's contradictory to other statements that he made to law enforcement and otherwise, but he wasn't afraid of Butts. . . . [H]e carried a gun because he was a drug dealer and he used the gun for protection. Was it protection from Butts and his folks? I'm sure it was. But it was also protection from the many other people that he dealt drugs to and dealt drugs with on the streets of Portsmouth.

*Id.* at 246-47. Babineau added that, in looking at Nicholson's criminal record "with all of the violence that he had in there, including gun violence and drugs, it was clear to me that that all made sense. He was telling me that he carried a gun because of the trade, the practice that he was in." *Id.* at 247. Nevertheless, Babineau acknowledged that he did not have any evidence, "[e]xcept what my client told me," contradicting Nicholson's claim to the authorities that he possessed the firearm on January 7, 2001, for protection from Butts. *Id.* at 305.

At the evidentiary hearing, Babineau expounded on his views of Nicholson's criminal history, testifying that it revealed to him that Nicholson "was a very violent person who had always carried a firearm." J.A. 660. Babineau also testified that, "[i]n our conversations, [Nicholson] told me repeatedly, more than once or twice or three times, that he carried a gun always. He always had." *Id.* at 661. According to Babineau, he specifically asked Nicholson whether he feared Butts, and Nicholson responded "that he was not afraid of Butts." *Id.* Nicholson ultimately agreed with Babineau that

a complete justification defense to the 18 U.S.C. § 922(g)(1) charge would be unsuccessful. *See id.* at 662.[13] Thereafter, however, despite Nicholson's exhortations that he do so, Babineau refused to request a self-defense departure at sentencing. Babineau explained that he did not make such a departure motion because he was not "in a position . . . to argue ethically to the Court that [Nicholson] possessed a gun because he was fearful of Mr. Butts," as Nicholson had told Babineau "that that's not the reason why he carried a gun." *Id.* at 672. Babineau acknowledged, however, that he knew from the Butts PSR that the Government had evidence tending to show that Butts had placed Nicholson on a "hit list" and was involved in the murder of Charles Nicholson and the attempted murder of Rudolph Nicholson — evidence that included witnesses other than Nicholson himself. *See id.* at 689-90. Babineau also conceded that he knew it was not necessary for Nicholson to testify at sentencing in support of a self-defense departure motion, and that he "knew that there were facts and witnesses in the Government's arsenal of things about Butts [being] a violent man and [making] threats against Nicholson." *Id.* at 690-91.

Babineau repeatedly stated during the evidentiary hearing that he did not perceive a conflict of interest at the time he was representing both Nicholson and Butts, nor did he presently believe a conflict had ever existed. *See, e.g.*, J.A. 670-71 ("I do not believe there existed a conflict between my representation of Mr. Nicholson, with all due respect to the Fourth Circuit's opinion, and my representation of Mr. Butts."). Babineau recalled that, following Nicholson's April 12, 2001 interview by ATF Agent Underwood, Nicholson "told [Babineau] what he told the agents" — specifically, that Nicholson "was not involved with Butts" and "that it was his

---

[13]In his letter to Babineau of July 9, 2001, Nicholson wrote that he knew he did not "have a chance with trial" absent suppression of the firearm, but he did not expound on why he believed that to be the case. *See* J.A. 470.

brother, Rudolph[,] [who] was a big time drug dealer . . . involved with Butts," though when Nicholson "returned back to the Tidewater area, . . . he started selling heroin again in Portsmouth." *Id.* at 659-60. Babineau further recalled that he had been informed by the prosecution, following Nicholson's interview by Underwood, that Nicholson had not provided any useful information about Butts. Babineau did not receive or review Underwood's notes of the interview until years later, a couple of days before Babineau's August 9, 2007 deposition.

During both his deposition and the evidentiary hearing, Babineau testified that he had lost most of his client files on Nicholson and Butts, but had turned over to the Government those files he could find (without Nicholson's or Butts's authorization and despite Nicholson's request for his own files). The existing files did not include any contemporaneous notes of Babineau's discussions with Nicholson.

3.

In assessing the adverse effect issue in the Remand Opinion, the district court ruled that Nicholson satisfied the first prong of the three-part *Mickens* standard, because "[t]here existed 'a plausible alternative defense strategy or tactic that [lawyer Babineau] might have pursued.'" Remand Opinion 38 (quoting *Mickens*, 240 F.3d at 361). The court further determined, however, that Nicholson failed to satisfy the second and third *Mickens* prongs, in that he failed to establish by a preponderance of the evidence that such "'alternative strategy or tactic was objectively reasonable under the facts of the case known to [Babineau] at the time of [his] tactical decision,'" and that Babineau's "'failure to pursue that strategy or tactic was linked to the . . . conflict.'" *Id.* (quoting *Mickens*, 240 F.3d at 361). Thus, the court once again denied Nicholson relief under 28 U.S.C. § 2255. *See id.* at 41.

Nicholson timely noted this appeal and, on June 25, 2008, we granted a COA "as to the issue of whether counsel's actual

conflict had an adverse effect on [Nicholson's] sentencing proceeding." We possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.

We review de novo a district court's legal conclusions in denying a 28 U.S.C. § 2255 motion. *See United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008). We also review de novo any mixed questions of law and fact addressed by the court on whether the petitioner has established a valid Sixth Amendment ineffective assistance claim. *See Nicholson I*, 475 F.3d at 248 (citing *Smith v. Angelone*, 111 F.3d 1126, 1131 (4th Cir. 1997) ("Whether counsel's performance was constitutionally adequate is a mixed question of law and fact which we review de novo." (internal quotation marks omitted))). When the court conducted an evidentiary hearing prior to ruling, we review its findings of fact for clear error. *See Stitt*, 552 F.3d at 350.

## III.

The usual standard for Sixth Amendment ineffective assistance claims is spelled out in the Supreme Court's seminal decision in *Strickland v. Washington*, which requires proof "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." 466 U.S. 668, 687 (1984). Where (as here) the ineffective assistance claim is premised on the existence of an actual conflict of interest, however, such claim is assessed under the standard outlined in *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The *Sullivan* standard requires a showing that (1) petitioner's lawyer operated under a "conflict of interest" and (2) such conflict "adversely affected his lawyer's performance." 446 U.S. at 348. If the petitioner makes this showing, prejudice is presumed and nothing more is required for relief. *See id.* at 349-50; *see also Rubin v. Gee*, 292 F.3d 396, 402 (4th Cir. 2002) (explaining that prejudice is presumed because, "[w]hen lawyers' con-

flicts of interest adversely affect their performance, it calls into question the reliability of the proceeding and represents a breakdown in the adversarial process fundamental to our system of justice").

We ruled in *Nicholson I* that Nicholson had satisfied his burden of establishing that lawyer Babineau had a conflict of interest when he represented Nicholson in his sentencing proceedings. *See* 475 F.3d at 251. As we recognized therein, however, "an adverse effect is not presumed from the existence of [a] conflict of interest." *Id.* at 249. Thus, we remanded for the district court's consideration of the adverse effect issue under the applicable three-part standard established by our Court in *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd without consideration of this point*, 535 U.S. 162 (2002). The specific issue before the district court on remand, and before us now, is whether Babineau's conflict of interest in simultaneously representing Nicholson and Butts adversely affected Babineau's performance in Nicholson's sentencing proceedings.

A.

The district court concluded that Nicholson satisfied the first prong of the three-part *Mickens* standard in that "[t]here existed 'a plausible alternative defense strategy or tactic that [lawyer Babineau] might have pursued.'" Remand Opinion 38 (quoting *Mickens*, 240 F.3d at 361). And indeed, a defendant is eligible for a downward departure below the applicable Sentencing Guidelines range if he "committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." *See* USSG § 5K2.12 (2000).[14] To be "sufficiently serious to warrant

---

[14]A complete justification defense requires a more stringent showing than a Guidelines self-defense departure, including proof of an "imminent and specific" threat of death or serious bodily injury. *United States v. Mooney*, 497 F.3d 397, 406 (4th Cir. 2007). Prior to our decision in *Nicholson I*, Nicholson had sought a COA on his claim that Babineau was ineffective in failing to raise the complete justification defense at the time of Nicholson's conviction. We granted the COA, however, on the sentencing-related claim only.

departure," the coercion must at least involve, inter alia, "a threat of physical injury." *Id.* On this record, a motion for a self-defense departure was a plausible defense strategy that Babineau might have pursued. Simply put, there is over-whelming evidence — believed and even endorsed by the Government — that Nicholson faced not only a threat of physical injury, but also a genuine threat of death, at the time he was found with the firearm and claimed he possessed it for self-protection. Thus, we agree with the district court that Nicholson made the required showing on the first *Mickens* prong.

### B.

Next, the district court ruled, on three separate grounds, that Nicholson failed to satisfy the second prong of the *Mickens* standard in that he failed to establish that a motion for a self-defense departure "'was objectively reasonable under the facts of the case known to [lawyer Babineau] at the time of [his] tactical decision.'" Remand Opinion 38 (quoting *Mickens*, 240 F.3d at 361). We address and reject each of the three grounds underlying the court's ruling on the second *Mickens* prong. In so doing, we emphasize that, although the second *Mickens* prong requires findings on the facts known to the lawyer at the time of his tactical decision, the ultimate question involves a conclusion of law reached under an objective standard: whether, considering the facts known to the lawyer, the alternative defense strategy was "objectively reasonable." *See Mickens*, 240 F.3d at 361; *cf. Cloaninger v. McDevitt*, 555 F.3d 324, 333 (4th Cir. 2009) (recognizing, in 42 U.S.C. § 1983 action, that "whether [officers'] conduct was objectively reasonable . . . is a question of law, not fact").

To be sure, a court's inquiry on the second *Mickens* prong does not induce the court to contemplate whether the alternative strategy was subjectively reasonable to the lawyer, nor does it require or permit the court to view the lawyer's performance under the "highly deferential" standard spelled out in

*Strickland. See Strickland*, 466 U.S. at 689 (instructing that "[j]udicial scrutiny of counsel's performance must be highly deferential," and that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"); *see also Beets v. Scott*, 65 F.3d 1258, 1269 (5th Cir. 1995) (en banc) (recognizing that *Strickland* contains a "more deferential standard of attorney competence" than does *Sullivan*). Indeed, to apply a subjective test or accord deference to the lawyer would pay no heed to the principle that "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing," *Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978) — the very principle animating the rule that "unconstitutional multiple representation is never harmless error," *Sullivan*, 446 U.S. at 349. *See also Mickens*, 535 U.S. at 176 ("The purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* [is] to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel."). With this understanding of the applicable objective standard, we turn to our assessment and rejection of the district court's three grounds for ruling that Nicholson failed to satisfy the second *Mickens* prong.[15]

---

[15]Additionally, with regard to the second *Mickens* prong, the district court considered and rejected the parties' contentions on the significance of the court's contemporaneous "Statement of Reasons" for the sentence imposed on Nicholson on August 29, 2001, which included a finding that Nicholson "possessed [the] weapon as his life was threatened." *See* Remand Opinion 33. On the one hand, the Government contended that, because this finding "demonstrate[d] that the Court accepted and acted upon the self defense theory," Nicholson suffered no prejudice and the adverse impact issue was moot. *Id.* The court rejected the Government's contention, however, explaining that it could not "speculate on what action it would have taken if additional evidence or argument had been presented on [Nicholson's] self defense theory," and that, in any event, there was no authority for the proposition "that the presumption of prejudice may be rebutted." *Id.* On the other hand, Nicholson contended that, because the court's "Statement of Reasons" reflected an understanding that Nicholson

1.

"First," according to the district court, "Babineau could not ethically present or argue facts to the Court which he knew were false." Remand Opinion 39 (the "Ethics Ground"). The court observed that, although "certain facts were already in the record in support of [a] self defense sentencing theory," Babineau knew from Nicholson's "comments to him and the federal agent" that self-defense was not Nicholson's true reason for carrying the firearm at the time of his January 7, 2001 arrest. *Id.* Thus, "Babineau could not ethically file and pursue a motion for downward departure based on self defense." *Id.*

In relying on the Ethics Ground, the district court explicitly credited Babineau's testimony that Nicholson had previously told Babineau "that he was not afraid of Butts and he carried a firearm because he dealt drugs." Remand Opinion 28. Because of our highly deferential standard of review, we are not in a position to disturb the court's credibility finding. *See United States v. Locklear*, 829 F.2d 1314, 1317 (4th Cir. 1987) ("Absent compelling evidence to the contrary, this Court declines to overturn a factual determination founded on witness demeanor and credibility."). Notably, however, the

possessed the firearm as the result of a threat on his life, it would have been objectively reasonable for Babineau to move for a self-defense departure. *See id.* at 34-35. In rejecting Nicholson's contention, the court observed that the "objectively reasonable" test "concerns whether the tactic was objectively reasonable to the attorney, Babineau, not whether it was later found persuasive by the Court. Clearly, Babineau was aware of facts weakening the self defense theory of which the Court was not aware at the time of the sentencing hearing." *Id.* at 35.

We similarly reject any reliance by either party on the district court's "Statement of Reasons." We take issue, however, with the court's description of the "objectively reasonable" test as being concerned with "whether the tactic was objectively reasonable to the attorney." Remand Opinion 35. This description suggests that the test is actually a subjective one or that the lawyer is owed deference — which would be at odds with the objective standard prescribed in *Mickens* and discussed above.

court's discussion of the Ethics Ground also suggests a finding that Nicholson, in his comments to the "federal agent" (i.e., ATF Agent Underwood), renounced his self-defense necessity claim. Any such finding would be clearly erroneous. *See United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008). As the court itself recognized earlier in the Remand Opinion, "on the offense date, Nicholson told Agent Underwood that he possessed the firearm for protection," and thereafter, "[o]n April 12, 2001, Nicholson told Underwood of his extensive history as a drug dealer which began in 1990 and extended until his arrest on January 7, 2001." Remand Opinion 27. There is no evidence or indication in the record that Nicholson told Underwood that self-defense necessity was not his true reason for possessing the firearm, or that Underwood ever drew such a conclusion on his own. At most, Nicholson's comments to Underwood, as thereafter relayed by Nicholson to Babineau, corroborated Nicholson's previous statements to Babineau that he had been dealing drugs around the time of his arrest. *See id.* (recounting Babineau's testimony that, "[a]fter Nicholson's April 12, 2001 interview with Agent Underwood, Nicholson told Babineau what he told the agent at that interview" — specifically "that when he returned to Tidewater he resumed selling heroin in Portsmouth"). Only Babineau connected Nicholson's drug dealing to his firearm possession.[16]

Accepting (as we must) the district court's finding that Babineau was credible, however, the court yet erred on the Ethics Ground in assessing and deciding a question of law — a conclusion that we review de novo. *See Stitt*, 552 F.3d at 350. The question resolved by the court was whether

[16]At the time of Nicholson's sentencing, Babineau's knowledge of the contents of the April 12, 2001 Agent Underwood interview was limited to the information relayed by Nicholson to Babineau. Babineau did not review Underwood's notes of the interview until years later, and those notes reflect only that Nicholson admitted dealing drugs around the time of his January 7, 2001 arrest, without connecting the firearm possession to the drug dealing.

Babineau, having been told by Nicholson that he did not fear Butts, was ethically prohibited from requesting a self-defense departure for Nicholson at sentencing. The court turned to the Virginia Rules of Professional Conduct and, more specifically, Rule 3.3 thereof. In relevant part, Rule 3.3, entitled "Candor Toward The Tribunal," prohibits a lawyer from knowingly "mak[ing] a false statement of fact or law to a tribunal"; "fail[ing] to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client"; or "offer[ing] evidence that the lawyer knows to be false." Rule 3.3 also authorizes a lawyer to "refuse to offer evidence that the lawyer reasonably believes is false."[17]

Notwithstanding these provisions of the Virginia Rules of Professional Conduct, it is manifest that Babineau could have requested a self-defense departure without compromising his ethical duties. This is so because a motion for a self-defense departure would not have required Babineau to make a false statement of fact or law to the sentencing court, to offer evidence that he knew or reasonably believed to be false, or to otherwise contravene the applicable ethics rules. Rather, Babineau could have made a self-defense departure motion on the strength of the truthful and undisputed evidence that Butts had posed a genuine threat to Nicholson's life, that Nicholson had claimed to the authorities that he possessed a firearm on January 7, 2001, for protection from Butts, and that the authorities believed him.

As Babineau conceded, he knew that Nicholson "need not testify at sentencing," J.A. 690, and that there was other evi-

---

[17]In addition to Rule 3.3, the court also invoked Rule 4.1, which pertains to transactions with persons other than clients. Rule 4.1, entitled "Truthfulness In Statements To Others," prohibits a lawyer, "[i]n the course of representing a client," from knowingly "[m]ak[ing] a false statement of fact or law," or "[f]ail[ing] to disclose a fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client."

dence — indeed, undisputed Government evidence — establishing Butts's murder of Nicholson's step-father, attempted murder of Nicholson's brother, and inclusion of Nicholson on a "hit list." As early as Nicholson's June 6, 2001 plea colloquy, the prosecution itself had informed the district court that Nicholson "stated that he had the firearm for his personal protection" and that it was "certainly reasonable to believe that someone might try to injure him or shoot him." J.A. 30. Thereafter, the prosecution interposed no objection to the Nicholson PSR's statement that Nicholson had advised the authorities "that he possessed the firearm for his own personal protection." *Id.* at 858. During Nicholson's August 29, 2001 sentencing hearing, the United States Attorney again informed the court that "when [Nicholson] was arrested, there were people out to kill him." *Id.* at 50. Quite tellingly, the Government has never abandoned its position that Nicholson was in real danger when he possessed the handgun — even acknowledging at oral argument in this appeal that, regardless of what Nicholson may have told Babineau, it would have been "absurd" for Nicholson not to fear Butts.

In these circumstances, the Rules of Professional Conduct did not bar Babineau from moving for a downward departure — or, more precisely, from arguing for the statutory minimum — on the basis of self-defense necessity. To the contrary, by making such a motion, Babineau simply would have been fulfilling his professional obligations to Nicholson. As Justice Powell once cogently observed, "lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support of their clients' positions and to contest with vigor all adverse evidence and views." *Gagnon v. Scarpelli*, 411 U.S. 778, 787 (1973); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) (recognizing that "the private attorney's role" is to serve "as the client's confidential adviser and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light"). Accordingly, we reject the premise of the Ethics Ground: that a self-defense

departure motion was not objectively reasonable under the facts known to Babineau at the time of sentencing because the applicable ethics rules barred him from making such a motion.

2.

Next, on the second *Mickens* prong, the district court ruled that a self-defense departure motion was not objectively reasonable because, based on the facts known to Babineau, asserting the self-defense theory could have damaged Nicholson's credibility and thereby jeopardized his chances for future Rule 35(b) relief. *See* Remand Opinion 39 (the "Rule 35(b) Ground"). The court explained that "assisting the Government in the hope of receiving a reduction in sentence under Rule 35(b) was [Nicholson's] primary objective throughout the litigation," and that Nicholson's credibility would have been damaged if he had "asserted through a motion for downward departure . . . that he only possessed the firearm in self defense, while also telling federal agents that he was selling drugs during the time he possessed the gun." *Id.* "This damage to [Nicholson's] credibility," according to the court, "could have reduced his prospect of having his sentence reduced under Rule 35(b)." *Id.*

The district court's Rule 35(b) Ground — involving a mixed question of law and fact that we review de novo, *see Nicholson I*, 475 F.3d at 248 (citing *Smith v. Angelone*, 111 F.3d 1126, 1131 (4th Cir. 1997)) — cannot be squared with the record. As an initial matter, the record reflects that neither ATF Agent Underwood (who twice interviewed Nicholson prior to his guilty plea) nor ATF Agent Logwood (who interviewed him postsentencing) perceived any inconsistency between Nicholson's self-defense claim and his admission that he had been dealing drugs around the time of his January 7, 2001 arrest. Rather, Agents Underwood and Logwood indicated that Nicholson provided truthful, albeit not useful, information. Moreover, even assuming that the prosecution could

have used Nicholson's admission of drug dealing to counter his self-defense claim, nothing in the record suggests that the prosecution would have taken that tack. Indeed, as Babineau himself has acknowledged, there is no evidence in this record — other than Babineau's testimony about what Nicholson told him during privileged attorney-client communications — to support the proposition that Nicholson possessed the firearm because he was a drug dealer rather than for protection from Butts. *See* J.A. 305 (Babineau's deposition testimony that his only evidence contradicting Nicholson's self-defense claim was "what my client told me").

The balance of the evidence reflects that, at the time of Nicholson's January 7, 2001 arrest, he was endangered by Butts. Nicholson was found in possession of a handgun that he had accepted from a friend in September 2000, on the day of his step-father's murder. Because the handgun was then inoperable, Nicholson took it to a local gun shop for repairs and then left for the Washington, D.C. area. On January 6, 2001, after returning to Portsmouth for Christmas and being treated at a hospital for his sickle cell anemia, Nicholson retrieved the now-repaired handgun and purchased ammunition. The next day, the authorities found Nicholson in possession of the handgun, but not in possession of any drugs, drug paraphernalia, unusual amounts of cash, or other indicia of present drug dealing. Furthermore, the authorities discovered no evidence that Nicholson had possessed any other firearm during the period between his release from state prison in 1999 and his federal arrest in April 2001, although he admittedly sold drugs during that time frame. And, Nicholson's extensive criminal record, which included convictions for both firearm and drug offenses, contained no history of Nicholson having simultaneously possessed firearms and drugs.

In summary, the evidence — other than Babineau's testimony about statements made to him by Nicholson — is entirely consistent with Nicholson's self-defense claim and inconsistent with Babineau's belief that Nicholson "carried a

gun because of the [drug] trade," J.A. 247, and "was a very violent person who had always carried a firearm," *id.* at 660. If, for example, Nicholson always carried a firearm in connection with his drug dealing, he would have possessed a firearm on the day of his step-father's murder and would have had no reason to accept an inoperable handgun from a friend.

Once again, we must credit Babineau's testimony and thus accept that Nicholson told Babineau his true reason for possessing the firearm was drug dealing, not self-defense. Nevertheless, as Babineau was well aware at sentencing, the balance of the evidence supported the self-defense (but not the drug dealing) theory. As such, it was not objectively reasonable for Babineau to refrain from moving for a self-defense downward departure for fear that Nicholson's credibility would somehow suffer and he would thereby be denied Rule 35(b) relief. Though we certainly do not condone Nicholson's ugly criminal record or his ongoing drug activities, there is a larger principle at stake here: Nicholson's Sixth Amendment right to the effective assistance of counsel. Hence, we are constrained to conclude that the Rule 35(b) Ground lacks merit.

3.

Lastly, on the second *Mickens* prong, the district court also ruled that a motion for a self-defense departure was not objectively reasonable because Nicholson's self-defense claim "could have been rebutted by [his] admissions of drug dealing to [ATF Agent Underwood and, thus,] could have proven to be a serious tactical error in arguing the period of imprisonment [Nicholson] should receive." Remand Opinion 40 (the "Invitation for Rebuttal Ground"). Put simply, the Invitation for Rebuttal Ground fails for the same reasons that the Rule 35(b) Ground is without merit. Thus, we reject each of the district court's three grounds for ruling that Nicholson failed to satisfy the second *Mickens* prong. Furthermore, for the reasons discussed above, we conclude that Nicholson has met his

burden of showing that a motion for a self-defense departure was objectively reasonable under the facts of the case known to Babineau at sentencing.

## C.

Turning to the third prong of the *Mickens* standard — whether Nicholson established that Babineau's failure to move for a self-defense departure "'was linked to the . . . conflict,'" Remand Opinion 38 (quoting *Mickens*, 240 F.3d at 361) — the district court accepted Babineau's testimony that "his reason for not filing a [self-defense] departure motion . . . was based upon the abovementioned tactical and ethical considerations, and not based upon his representation of Butts." *Id.* at 40-41. The court observed that,

> [w]hile Babineau's decision to represent Butts and Nicholson indicates a lapse in judgment, it does not diminish Babineau's credibility before the Court. Babineau testified in person before the Court, and the Court had the opportunity to observe his manner and consider his testimony in light of the other evidence and testimony in the case. The Court found Babineau believable as a witness, despite the attempted attacks on his credibility by [Nicholson].

*Id.* at 41. The court thus ruled that Nicholson "failed to meet his burden of proof on the linkage issue by a preponderance of the evidence." *Id.*

As previously noted, we are bound to accept the district court's credibility finding.[18] Nevertheless, the court erred by

---

[18]There are ample reasons, however, to infer that Babineau was less than forthcoming in these proceedings, including the following: other than Babineau's testimony, the record fully supports Nicholson's self-defense claim; a plethora of evidence — especially Nicholson's letters to Babineau, *see supra* note 10 — contradicts Babineau's testimony that he

rejecting Nicholson's proof on the link issue and instead rely-
ing on Babineau's testimony about his subjective motives to
withhold relief from Nicholson on his actual conflict of inter-
est claim.

Significantly, in writing for the en banc majority in *Mick-
ens*, Judge Widener adopted for our Court the three-part
adverse effect standard utilized by the Eleventh Circuit in
*Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999)
(en banc). With respect to the third prong — that counsel's
failure to pursue the objectively reasonable defense strategy
was linked to the conflict — the *Freund* court explained that
the petitioner is entitled to prove such a link in either of two
ways: (1) by "establish[ing] that the alternative defense was
inherently in conflict with . . . the attorney's other loyalties or
interests" (the "first aspect of the *Freund* test"), or (2) by oth-
erwise showing that the alternative defense was "not
undertaken due to" those other loyalties or interests (the "sec-
ond aspect of the *Freund* test"). *See* 165 F.3d at 860 (internal
quotation marks omitted). The *Freund* court's test on the link
issue is a longstanding and widely utilized standard for deter-
mining whether a conflict of interest adversely affected a law-
yer's performance. *See, e.g.*, *United States v. Levy*, 25 F.3d
146, 157 (2d Cir. 1994) (applying same test); *United States v.
Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (same); *United
States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985) (same); *see
also United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir.
1990) ("[D]efense counsel's performance was adversely

---

was told by Nicholson that drug dealing was his true and only reason for
carrying the firearm; Babineau produced no contemporaneous notes of his
conversations with Nicholson, having lost the majority of his files on both
Nicholson and Butts; Babineau turned over what records he did possess
on Nicholson and Butts to the Government without Nicholson's (or,
worse, Butts's) authorization and despite Nicholson's request for his own
records; and Babineau yet will not acknowledge — and, in fact, continues
to deny — that his simultaneous representation of Nicholson and Butts
created a conflict of interest.

affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests.").[19]

Under the first aspect of the *Freund* test, if the petitioner shows — as Nicholson clearly has here — "that the alternative defense was inherently in conflict with . . . the attorney's other loyalties or interests," *see* 165 F.3d at 860 (internal quotation marks omitted), he thereby satisfies his burden of proving the requisite link and there is no need to consider the second aspect of the *Freund* test. *Cf. United States v. Williams*, 372 F.3d 96, 106-07 (2d Cir. 2004) (concluding that, because it was "clear that Williams' defense was 'inherently in conflict with [his lawyer's] other loyalties or interests,'" Williams had sufficiently "demonstrated the requisite lapse in his representation"); *Lopez v. Scully*, 58 F.3d 38, 42-43 (2d Cir. 1995) (ruling that the "inherently in conflict" standard was satisfied where "the judge had the discretion to impose a lower sentence and arguable grounds for leniency existed," but the lawyer "had the incentive to undermine [his client's] credibility . . . in order to reduce the risk of recriminations for any [of the lawyer's own] improper conduct"). In simple terms, an alternative defense and the lawyer's other loyalties or interests are "inherently in conflict" if they are "inconsis-

---

[19]Notably, the First, Second, Third, and Tenth Circuits utilize a two-part adverse effect test, in contrast to the three-part standard employed by the Eleventh Circuit in *Freund* and adopted by our Court in *Mickens*. The two-part test omits the second *Mickens* prong, which requires the petitioner to demonstrate that the alternative defense was "objectively reasonable" under the facts known to the lawyer at the relevant time. *See Eisemann v. Herbert*, 401 F.3d 102, 107-08 (2d Cir. 2005) (deeming the Fourth and Eleventh Circuits' standard, because of its additional objective reasonableness requirement, to be "slightly more demanding" than the Second Circuit's approach). Nevertheless, the two-part test encompasses the first *Mickens* prong (the "plausible alternative defense" requirement) and, significantly, the third *Mickens* prong (the "link" requirement). As such, it is helpful to look to decisions of the First, Second, Third, and Tenth Circuits for guidance on the link issue.

tent" with each other. *See United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995) (recognizing that "the applicable standard requires only the demonstration of a conflict inconsistent with a plausible trial strategy or tactic"). In such a situation, it is unnecessary — and even inappropriate — to accept and consider evidence of any benign motives for the lawyer's tactics, including the lawyer's testimony about his subjective state of mind. *See id.* (observing that "after-the-fact testimony by [the conflicted] lawyer . . . is not helpful," as "[e]ven the most candid persons may be able to convince themselves that they actually would not have used that strategy or tactic anyway").[20]

---

[20]We do not suggest that courts may never consider a conflicted lawyer's explanation for his actions in order to determine whether the lawyer's failure to pursue an alternative defense strategy was linked to the conflict of interest. Rather, we conclude only that in cases such as this one — where the strategy at issue was plausible, objectively reasonable, and inherently in conflict with the lawyer's other loyalties or interests — consideration of the lawyer's explanation is not helpful. In different circumstances, however, it may be appropriate, in assessing the link issue, to consider the lawyer's testimony on his subjective motives. For example, in *Stephens v. Branker*, we credited the testimony of a (presumably) conflicted lawyer "that his trial strategy . . . was based solely on a tactical decision" and was not linked to any conflict of interest. *See* 570 F.3d 198, 212 (4th Cir. 2009). Unlike lawyer Babineau, the lawyer in *Stephens* had not failed to pursue an objectively reasonable defense strategy that was inherently in conflict with the lawyer's loyalties to another client. Rather, the *Stephens* lawyer had pursued a theory arguably in conflict with his other loyalties — "as far as the evidence would take it" — even though such strategy was *not* objectively reasonable. *See id.* at 211-13; *see also Freund*, 165 F.3d at 868-69 (crediting lawyer's testimony on link issue in circumstances similar to those in *Stephens*). *Stephens* exemplifies one type of case where the lawyer's testimony may properly be considered. Another such type of case may be one in which the petitioner cannot establish, under the first aspect of the *Freund* test, "that the alternative defense was inherently in conflict with . . . the attorney's other loyalties or interests," but otherwise seeks to show, under the second aspect of the *Freund* test, that the alternative defense was "not undertaken due to" those other loyalties or interests. *See* 165 F.3d at 860 (internal quotation marks omitted).

Although, prior to today, we had not explicitly adopted the *Freund* court's test on the link issue under the third *Mickens* prong, its application is entirely consistent with relevant Supreme Court and Fourth Circuit precedent. The Supreme Court, for example, has determined that a conflicted lawyer's omissions — "fail[ure] to cross-examine a prosecution witness" and "fail[ure] to resist the presentation of arguably inadmissible evidence" — "resulted from counsel's desire to diminish the jury's perception of a codefendant's guilt." *Sullivan*, 446 U.S. at 349 (discussing Court's prior decision in *Glasser v. United States*, 315 U.S. 60, 72-75 (1942)). The Court so ruled because "the evidence of counsel's 'struggle to serve two masters [could not] seriously be doubted.'" *Id.* (quoting *Glasser*, 315 U.S. at 75) (alteration in original).

As for this Court's own precedent, our decision in *Rubin v. Gee*

> involved two attorneys who in the aftermath of a crime schooled their client [Rubin] in the tactics of evasion in order to guarantee their own fee. Then to avoid criminal indictment and keep their conduct from coming to light, the attorneys took cover as part of the defense team. While the prosecution harped at trial on Rubin's actions immediately following the crime, the attorneys could not be called as fact witnesses and their role in directing Rubin's actions was never explained.

292 F.3d 396, 398 (4th Cir. 2002). After concluding that having the conflicted attorneys testify "was a plausible alternative defense strategy which was reasonable under the facts of the case," the panel majority in *Rubin* had no trouble deciding that "the failure to pursue this strategy was linked to [the attorneys'] conflict of interest." *Id.* at 405. Writing for the majority, Judge Wilkinson characterized the conflict's adverse effect as "self-evident," *id.* at 398, and explained that the attorneys "had a powerful conflicting interest in shielding

themselves from testifying to conceal their role in the events following the homicide," *id.* at 403. Significantly, the majority so concluded notwithstanding the dissenting view that — based on the testimony of non-conflicted members of the defense team (which the state habeas court had deemed credible) — there was no link between the other attorneys' conflict and their failure to testify. *See id.* at 411 (Motz, J., dissenting) ("Given this state-court finding, Rubin has not established and cannot establish the necessary 'link[ ]' between [the attorneys' conflict] and the decision she challenges." (first alteration in original)).

In *Mickens*, the petitioner asserted that his lawyer labored under an actual conflict of interest in representing Mickens on a murder charge, because the lawyer had previously represented Mickens's murder victim. *See* 240 F.3d at 351. We affirmed the district court's ruling that "any viable defense strategies" — including investigation into leads as to possible alternative perpetrators and fuller cross-examination of a key prosecution witness — "were not linked to [the] attorney's conflict of interest." *Id.* at 362. In other words, there was no discernible inconsistency between those particular strategies and the lawyer's duty of loyalty to Mickens's victim. As such, Mickens could not prove "that the alternative defense was inherently in conflict with . . . the attorney's other loyalties or interests." *See Freund*, 165 F.3d at 860 (internal quotation marks omitted).[21] The same would be true of a hypothetical

---

[21]Additionally, Mickens could not otherwise show, under the second aspect of the *Freund* test, that any viable defense strategies were "not undertaken due to the lawyer's other loyalties or interests." *See Freund*, 165 F.3d at 860 (internal quotation marks omitted). We did not rule in *Mickens*, however, that there was no link between other strategies not pursued and the conflict of interest where such strategies were, on their face, inherently in conflict with the lawyer's loyalty to the victim. Rather, we concluded that those strategies were not objectively reasonable, without reaching the link issue. *See Mickens*, 240 F.3d at 361-62. Furthermore, in several decisions prior to *Mickens*, we determined that actual conflicts of interest were proven where the defense strategies in question were inher-

claim by Nicholson that Babineau's conflict caused him to refrain from seeking a downward departure on the ground of Nicholson's serious health condition. Although arguably a plausible and objectively reasonable strategy (being one that Babineau actually did pursue), such a downward departure motion was not inherently in conflict with Babineau's representation of Butts.

A self-defense departure motion, by contrast, was inherently in conflict with Babineau's loyalties to Butts — a point we emphasized in *Nicholson I* in the context of ruling that Babineau was laboring under a conflict of interest. *See United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991) (recognizing that *Sullivan*'s "two requirements" — a "conflict of interest" and an "adverse effect on counsel's performance" — "are often intertwined, making the factual analyses of them overlap" (emphasis omitted)). Of course, our conflict-of-interest inquiry in *Nicholson I* focused on whether Nicholson's and Butts's particularized "'interests diverged with respect to a material factual or legal issue or to a course of action.'" *See Nicholson I*, 475 F.3d at 249 (quoting *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998) (en banc)). The course of action at issue was moving for a self-defense departure during Nicholson's sentencing proceedings. If he made the motion,

___

ently in conflict with the lawyers' other loyalties or interests. *See United States v. Swartz*, 975 F.2d 1042, 1046 (4th Cir. 1992) (observing that, while representing codefendants, the lawyer pursued a strategy on behalf of one client that was "inherently damaging" to the second client's position); *United States v. Tatum*, 943 F.2d 370, 380 (4th Cir. 1991) (recognizing that the "known facts [led] inevitably to the conclusion that [the lawyer] had unacceptable conflicts of interest," where, inter alia, "obvious avenues for a full defense were not pursued, avenues which might have assisted [the defendant] but would have clearly had adverse effects on [the lawyer] and his law firm"); *Hoffman v. Leeke*, 903 F.2d 280, 286 (4th Cir. 1990) (concluding, notwithstanding the lawyer's testimony to the contrary, that "a conflict was patent" and its adverse effects clear where the lawyer advised one client to testify against another client as part of a plea agreement).

Babineau would act contrary to (and disloyal to) the interests of client Butts by portraying him as a murderer, thus potentially jeopardizing Butts's position on appeal and in any future prosecutions. By failing to make the motion, Babineau would act contrary to (and disloyal to) the interests of client Nicholson. Accordingly, as we explained in *Nicholson I*, "Nicholson's interests, on the one hand, and Butts's interests, on the other, were in total opposition to each other during Babineau's simultaneous representation of them." *Id.* at 249-50. This simultaneous representation placed Babineau "in the untenable position of having to place the interests of one client (either Butts or Nicholson) above another (either Nicholson or Butts)." *Id.* at 251. In these circumstances, a conflict of interest existed regardless of whether Babineau ultimately chose to pursue a self-defense departure motion on behalf of Nicholson.

The question now before us is whether Babineau's conflict of interest had an adverse effect on Nicholson. If Babineau had zealously advocated for a self-defense departure, it is unlikely that Nicholson could demonstrate that he was harmed by the conflict (though Butts might have a viable Sixth Amendment claim). The fact is, however, that Babineau did not move for a self-defense departure on Nicholson's behalf. Viewed in this context, it is "self-evident" that Babineau was possessed of a conflict of interest that was inescapably — and, indeed, inherently — linked to the alternative defense strategy not pursued: moving for a self-defense departure. *Cf. Rubin*, 292 F.3d at 398. In other words, the competing interests of Nicholson and Butts were plainly stuck to Babineau's tactical considerations with respect to the self-defense departure motion — that is, Babineau's conflict of interest was inextricably woven into the alternative defense strategy. Indeed, it was an essential characteristic and attribute thereof.[22]

---

[22]As *The New Oxford American Dictionary* (2d ed. 2005) explains, "inherent" is derived from the Latin "*inhaerent*– 'sticking to,' from the verb *inhaerere*, from *in*– 'in, toward' + *haerere* 'to stick.'" It is further defined therein as "existing in something as a permanent, essential, or characteristic attribute."

Thus, Babineau's conflict of interest was inherently linked to the tactic of moving for a self-defense departure motion on Nicholson's behalf — unlike other alternative defense strategies that could be conjured up, such as (from the example discussed above) a health-related departure motion, which would not have required Babineau to act contrary or disloyal to the "inconsistent" interests of his other client Butts. *See Malpiedi*, 62 F.3d at 470.

In summary, because a self-defense departure motion was inherently in conflict with Butts's interests, Nicholson has proven — by much more than a preponderance of the evidence — the necessary link between Babineau's conflict of interest and his failure to move for a self-defense departure, thus satisfying the third and final *Mickens* prong.[23] Having also met his burden of proof on the first and second *Mickens* prongs, Nicholson is entitled to § 2255 relief — specifically, remand for resentencing.

## IV.

Having concluded that Nicholson is entitled to § 2255 relief, we turn to the Government's suggestion on appeal that Nicholson's habeas corpus petition has essentially been rendered moot because he has no chance of successfully pursuing a self-defense departure on resentencing. The Government

---

[23]Importantly, proof of an inherent conflict between the alternative defense strategy in question and the lawyer's other loyalties or interests satisfies only the third *Mickens* prong. It does not relieve the petitioner of his burden of proof on the first and second *Mickens* prongs. *See Hunter v. Sec'y, Dep't of Corr.*, 395 F.3d 1196, 1201-02 (11th Cir. 2005) (recognizing that *Freund*'s "inherently in conflict" test does not eliminate adverse effect requirement). The district court's analysis on the third *Mickens* prong, however, would undermine *Mickens*'s three-part standard. In finding no link between Babineau's conflict of interest and his failure to move for a self-defense departure, the district court relied on Babineau's credible testimony that such a motion was not a subjectively reasonable tactic. As such, the court rendered pointless any assessment of the objective reasonableness issue under the second *Mickens* prong.

maintains that, because lawyer Babineau has revealed to the sentencing court confidential attorney-client communications made to him by Nicholson (and the court has credited Babineau's testimony), "a new sentencing could not have any effect, except possibly to eliminate the benefit of having the district court believe based on an incomplete record that there was more to a self-defense argument than there really is." Br. of Appellee 47. We are surprised by and disagree with the Government's position and its underlying premise: that resentencing will be a worthless exercise because Nicholson's confidential communications to Babineau can be used against Nicholson on remand.

First of all, on remand for resentencing, Nicholson should be entitled to a protective order prohibiting the Government from using privileged information revealed by Babineau in litigating Nicholson's actual conflict of interest claim. *See Bittaker v. Woodford*, 331 F.3d 715, 717 (9th Cir. 2003) (en banc) (rejecting contention that state prisoner "completely waived" his attorney-client privilege by asserting ineffective assistance claims in federal habeas proceedings, and affirming district court's protective order precluding use of privileged materials for any purpose other than litigating federal habeas petition). As Judge Kozinski cogently explained for the en banc *Bittaker* court,

> [a] narrow waiver rule is . . . consistent with the interests of the habeas petitioner in obtaining a fair adjudication of his petition and securing a retrial untainted by constitutional errors. . . . If a prisoner is successful in persuading a federal court to grant the writ, the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free. Giving the prosecution the advantage of obtaining the defense casefile — and possibly even forcing the first lawyer to testify against the client during the second trial —

would assuredly not put the parties back at the same starting gate.

*Id.* at 722-23. "What's more," the *Bittaker* court recognized, "requiring the petitioner to enter . . . a broad waiver would force him to [a] painful choice" — a choice between "asserting his ineffective assistance claim and risking a trial where the prosecution can use against him every statement he made to his first lawyer," or "retaining the privilege but giving up his ineffective assistance claim." *Id.* at 723. With these principles in mind, the *Bittaker* court not only characterized the district court's entry of a protective order as being "entirely justified," but also observed that the court "would have abused its discretion" had it not entered such an order. *Id.* at 728. We agree with the Ninth Circuit's approach in *Bittaker*, which would entitle Nicholson to a protective order on remand.

Additionally, we find ourselves constrained to direct the assignment of a new judge for Nicholson's resentencing proceedings. Although "this is not a case requiring remand to a different judge because of bias," it is one of those "unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir. 1991) (internal quotation marks omitted). On this issue, there are three points for consideration: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected"; "(2) whether reassignment is advisable to preserve the appearance of justice"; and "(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* (internal quotation marks omitted); *see also United States v. Lentz*, 383 F.3d 191, 222 (4th Cir. 2004) (applying same standard).

Here, as the Government has underscored, the original judge has expressed the view that lawyer Babineau credibly testified about being advised by Nicholson that he possessed the firearm because of his drug dealing, and not for self-protection. Under *Bittaker*, however, Nicholson's privileged communications with Babineau could not be admitted in the remand proceedings. Because the original judge "cannot reasonably be expected to erase the earlier impressions from his mind" — or, indeed, "may tend to lean over backwards or overreact in an effort to be fair and impartial" — we are constrained to remand for resentencing by a different judge. *See Guglielmi*, 929 F.2d at 1008 (internal quotation marks and alterations omitted). In so ruling, we imply no personal criticism of the original judge or his handling of Nicholson's § 2255 proceedings. Rather, we reserve our criticism for Babineau and his failure to recognize and disclose the conflict of interest that prevented Nicholson from enjoying his Sixth Amendment right to effective representation. As such, we equate this matter with those in which the Government has breached a plea agreement and a remand for resentencing by a new judge is essential to preserving the appearance of justice. *See, e.g.*, *Santobello v. New York*, 404 U.S. 257, 263 (1971) (observing that such remedy "is in no sense to question the fairness of the sentencing judge; the fault here rests on the prosecutor, not on the sentencing judge"). Furthermore, "[w]e do not believe that any waste or duplication would be out of proportion to the appearance of fairness a reassignment will preserve." *See Lentz*, 383 F.3d at 222.

## V.

Pursuant to the foregoing, we reverse the judgment of the district court and remand for resentencing.

*REVERSED AND REMANDED*

KEELEY, District Judge, concurring-in-part and dissenting-in-part:

I concur in Parts I, II and III of the majority's opinion holding that Nicholson has met his burden of establishing that his attorney's actual conflict of interest adversely affected his representation of Nicholson. I also concur in the decision to grant Nicholson relief under 28 U.S.C. § 2255. I respectfully dissent, however, from the direction to assign a new judge to resentence Nicholson.

At Nicholson's initial sentencing, the district court adopted the pre-sentence report ("PSR"), which recommended a base offense level of 30 and a criminal history category of VI. These factors placed Nicholson in a guideline range of 168-210 months, with a mandatory minimum sentence of 180 months.[1] Ultimately, the district court sentenced Nicholson to 189 months. Therefore, today's decision leaves the sentencing judge with a narrow, nine month window of discretion in which to resentence Nicholson.[2] For the following reasons, I believe that this Court may entrust the responsibility of resentencing Nicholson to the trial judge.

First, the district court has proven willing to implement this Court's decisions regarding Babineau's conflict of interest and its impact upon Nicholson's eligibility for relief under § 2255. The district court ably reheard *Nicholson I* on remand, finding, despite its prior ruling and as directed by this Court, that Babineau suffered an actual conflict of interest. After

---

[1]"Based on his criminal history, Nicholson was sentenced as an armed career criminal under 18 U.S.C. § 924(e)." *U.S. v. Nicholson*, 475 F.3d 241, n. 6 (4th Cir. 2007) ("Nicholson I"). He therefore faced a mandatory minimum sentence of 180 months and a maximum sentence of life. *Id.*

[2]Nicholson pleaded guilty to possession of a firearm and ammunition by a felon, in violation of §§ 922(g)(1), 924(a)(2) and 924(e). *Nicholson*, 475 F.3d at 246. Because Nicholson possessed a firearm in connection with the offense, he is ineligible for the "safety valve" limitation of applicability of statutory minimum sentences. U.S.S.G. § 5C1.2 (Nov. 2009).

finding that Babineau suffered an actual conflict, it then applied the relevant authority, *Mickens v. Taylor*, 240 F.3d 348 (4th Cir. 2001) (en banc), as commonly understood at that time. In doing so, the district court found that Nicholson had satisfied the first part of the *Mickens* test by concluding that "[t]here existed 'a plausible alternative defense strategy or tactic that [Babineau] might have pursued.'" Remand Opinion at 38 (quoting *Mickens*, 240 F.3d at 361). Although the district court erroneously found that Nicholson could not establish either the second or third parts of the *Mickens* test, it did so without the benefit of today's clarifications of that test. Based on the district court's willingness to accept and apply prior decisions in this case, it should be given the chance to apply today's decision on remand, just as it did in *Nicholson I*.

Second, notwithstanding the district court's prior decisions in this case, it is nonetheless capable of resentencing Nicholson on the evidence of the threats of Butts to Nicholson's life, and reaching a reasonable sentence based not only on a motion for departure for self-defense, but also the factors under 18 U.S.C. § 3553(a). To be sure, as the majority recognizes, there is no dispute that the district judge is willing to treat Nicholson fairly. *Ante* at 43. Therefore, this case is vastly different from the case relied on by the majority in support of its decision to remove the district judge on remand. There the district judge "repeatedly adhered to an erroneous view after the error [was] called to his attention," thus necessitating reassignment to another judge. *United States v. Guglielmi*, 929 F.2d 1001, 1004, 1007 (4th Cir. 1991). In addition, the district judge had expressed on the record his inability to forget the egregious nature of the evidence presented at trial. *Id.* at 1006. Here, in contrast, the district court has shown itself not only capable of applying this Court's rulings but also willing to revise its own assessment of the facts relevant to sentencing.

For the foregoing reasons, I would remand this case to the trial judge.