**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-6594**

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

MATTHEW QUINN MASON, a/k/a Q,

              Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg. John Preston Bailey, Chief District Judge. (3:08-cr-00030-JPB-JES-2; 3:11-cv-00060-JPB-JES)

Argued: December 10, 2013          Decided: January 23, 2014

Before TRAXLER, Chief Judge, and WILKINSON and DAVIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Brendan S. Leary, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Wheeling, West Virginia, for Appellant. Erin K. Reisenweber, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee. **ON BRIEF**: William J. Ihlenfeld, II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this case, petitioner Matthew Quinn Mason raises an ineffective assistance of counsel claim on collateral review. For the reasons that follow, we affirm the district court's dismissal of his 28 U.S.C. § 2255 petition.

I.

Early in the morning of April 30, 2008, Mason and another man, known in the record only as "Tank," approached Darryl Clinkscale inside the Martinsburg, West Virginia Wal-Mart where Clinkscale worked. After ascertaining that Clinkscale worked at the Wal-Mart, the men remained in the store until he clocked out for a break. Clinkscale exited the store, walked to his car, and left for home. Mason and Tank also left the store and climbed into a car already occupied by a third man, Travis Latta. According to Latta, Tank asked Mason, who was driving, to follow Clinkscale out of the parking lot.

Clinkscale recognized that he was being followed and attempted to evade his pursuers, which he succeeded in doing for a short period. Once he arrived at his apartment complex and turned off his headlights, however, the car containing the three men pulled in behind him. At that point, Clinkscale drove out of the parking lot, and Tank and Latta both opened fire. Some bullets struck Clinkscale's car but none hit him or disabled the

2

vehicle. Clinkscale sped off in one direction and Mason drove off in another to a nearby highway.

Mason and Latta were indicted the following month for crimes arising from this episode. Tank was never identified. The three count indictment charged Mason and Latta with conspiracy to retaliate against a witness in violation of 18 U.S.C. §§ 1513(f), 1513(a)(1)(A), retaliation against a witness in violation of 18 U.S.C. § 1513(a)(1)(A), and damage to the property of another in retaliation for witness testimony in violation of 18 U.S.C. § 1513(b)(1).[*] The government alleged, based partly on testimony from Clinkscale himself, that Mason had participated in the shooting as retaliation for Clinkscale having testified against a co-defendant named Cecil Ray in August of 2007.

On October 16, 2008, the government served notice that Clinkscale would testify about Mason's ability to recognize him from the time they served together in the Eastern Regional Jail ("ERJ") in 2007. On October 25, two days before the trial, the government provided further notice that Clinkscale would testify as to interactions between himself and Mason in the ERJ in the days surrounding Clinkscale's testimony at Ray's trial. On the

---

[*] Latta later entered a plea agreement with the government and testified at Mason's trial.

3

first day of Mason's trial, his attorney Lary Garrett objected to the government's use of this evidence, and noted that he had seen it for the first time that morning. The district court overruled Garrett's objection, at which point the attorney asked for time to confer with his client, which the court granted. Garrett did not move to continue the trial in order to investigate Clinkscale's claims about his interactions with Mason, and the trial went forward.

Clinkscale testified at trial that he had been in the ERJ for three weeks in order to appear at Ray's August 2007 trial. ERJ housing records show that during a ten-day period within those three weeks, from August 13, 2007 to August 23, 2007, Clinkscale and Mason were housed in the same pod of cells. The records further indicate that Clinkscale's cell was directly above Mason's. Clinkscale testified to three interactions between himself and Mason that occurred in the ERJ. First, he stated that Mason threw him a bar of soap on which it was inscribed: "that dude from Philly is a snitch." Clinkscale, like Ray, was a Philadelphia native. Clinkscale also testified that the night before he took the stand in Ray's trial, Mason summoned Clinkscale to his cell to speak to Ray, who was standing on the other side of the window in the recreation yard. While Mason stood by, Ray attempted unsuccessfully to persuade Clinkscale to lie for him at trial. Finally, Clinkscale claimed

4

that when he returned to his pod in the ERJ after testifying, an inmate standing at the door to the adjacent pod remarked to a gathered group of inmates that Clinkscale had "told on somebody." Clinkscale stated that he believed that Mason was standing in the area when this announcement was made. Garrett cross-examined Clinkscale as to these interactions.

The government presented additional evidence beyond Clinkscale's testimony. It showed Wal-Mart surveillance footage of the men interacting inside of the store, exiting the store, and leaving the parking lot in their two cars. Mason's co-defendant Latta testified about events on the morning of the shooting. Various law enforcement officials also provided testimony regarding the events of the morning of the shooting and related forensic evidence.

After a two-day trial, the jury convicted Mason on all three counts, and he was sentenced to 95 months on each, the terms to run concurrently. Mason, still represented by Garrett, appealed to this court, arguing that the evidence was insufficient to support conviction and that the district court abused its discretion when it admitted Clinkscale's testimony regarding his interactions with Mason in the ERJ. We affirmed the district court. See United States v. Mason, 374 F. App'x 411 (4th Cir. 2010).

5

In July 2011 Mason filed the instant § 2255 petition. The district court denied relief. This court, however, vacated the district court's order and remanded the case, noting the possible merit of the sole issue before the court now: whether Garrett failed to investigate evidence about Clinkscale's interactions with Mason at the ERJ that could have been used to impeach Clinkscale's trial testimony. See United States v. Mason, 481 F. App'x 815, 818 (4th Cir. 2012).

Upon remand, the magistrate judge held a hearing to determine, inter alia, whether Garrett had failed to perform the proper investigation. The magistrate evaluated exhibits from both Mason and the government regarding the housing arrangements at the ERJ and heard testimony from Mason, Garrett, and a prison official. He also received post-hearing briefing from the parties. He then recommended based on this evidence that Garrett's failure to investigate did not constitute ineffective assistance of counsel. The district court adopted the magistrate's report and dismissed Mason's petition. Mason now appeals.

## II.

### A.

We review a district court's legal conclusions in denying a § 2255 petition de novo. See United States v. Nicholson, 611

6

F.3d 191, 205 (4th Cir. 2010). Where a district court has held an evidentiary hearing before ruling, we review its findings of fact for clear error. Id. The question of whether counsel's performance was constitutionally adequate is a mixed question of fact and law that we review de novo. Id.

Claims for ineffective assistance of counsel are evaluated under the familiar two-pronged test outlined in Strickland v. Washington, 466 U.S. 668 (1984). A petitioner must show both that "counsel's performance was deficient" (the "performance prong") and that "the deficient performance prejudiced the defense" (the "prejudice prong"). Id. at 687. To satisfy the performance prong, a petitioner must show that his counsel's performance "fell below an objective standard of reasonableness" such that the "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 688. The Supreme Court has recognized that, in order to avoid "the distorting effects of hindsight," courts should employ "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

The prejudice prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's

7

performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Harrington v. Richter, 131 S. Ct. 770, 791 (2011). Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." Id. at 792.

The Supreme Court counseled in Strickland that "there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. Here, we need only discuss the prejudice prong, and Mason's failure to satisfy it, in order to resolve the appeal.

B.

Mason contends that his trial counsel performed ineffectively when he failed to request a continuance in order to investigate the facts surrounding the jailhouse interactions of Mason and Clinkscale. This lack of investigation, he contends, fell below the objective standard of reasonableness demanded of trial counsel.

Mason argues that had Garrett performed this investigation, he would have been able to successfully impeach Clinkscale's testimony because the housing records would have shown that the interactions to which Clinkscale testified could not have occurred when or as he said they did. In particular, Mason contends that the housing records show he was in the SHU on the

8

night Clinkscale claimed to have interacted with Ray from Mason's cell. According to Mason, this evidence would have shown the jury that Clinkscale was providing false testimony. The jury would have then proceeded to disregard Clinkscale's testimony as to Mason's intent, leaving the prosecution without evidence of this central element of the crime.

As an initial matter, the housing records that Garrett allegedly failed to investigate were impeachment -- rather than direct -- evidence. While there are times that a failure to investigate impeachment evidence can satisfy the prejudice prong, that is less likely to be the case than a failure to investigate direct evidence. See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1221 (4th Cir. 1986) (refusing to disturb a jury's guilty verdict in spite of defense counsel's failure to investigate certain methods for impeaching a key prosecution witness). Moreover, Mason's claim is further weakened by counsel's cross-examination of the witness at trial. See Tucker v. Ozmint, 350 F.3d 433, 445 (4th Cir. 2003) (finding no showing of prejudice where counsel had exposed some weaknesses of a witness's testimony but not others). The record clearly shows that Garrett vigorously questioned Clinkscale about the details of his account and discrepancies between his trial testimony and his previous statements. The jury had thus seen Clinkscale's credibility questioned and his testimony challenged on the

9

stand. Mason cannot show the necessary substantial likelihood that cross-examination using the housing records to impeach Clinkscale would have changed the trial's outcome.

Mason contends that if his trial counsel had only impeached Clinkscale with the housing records, the government would have lost its sole evidence of retaliatory intent, which was a required element of each offense for which Mason was convicted. This assertion, however, crumbles under the weight of the evidence. The magistrate judge held an evidentiary hearing on this specific issue, and concluded that the housing records only reinforced Clinkscale's account. The district court, when it adopted the magistrate's report and recommendation, also found that the housing "arrangements appear to support Clinkscale's testimony." J.A. 751.

We are not persuaded that the housing records tend to undermine more than they corroborate Clinkscale's testimony. Mason spends a good deal of time arguing that particular interactions could not have happened exactly how and when Clinkscale said they did. But there is a danger here in missing the forest for the trees. In focusing on the smaller details, Mason misses what the magistrate judge and district court did not: that the circumstances of his and Clinkscale's housing in the ERJ as reported in the records are consistent on a fundamental level with the account in Clinkscale's testimony.

10

They were housed together in the same pod of the ERJ for a ten-day period -- a period shortly before Ray's trial. Clinkscale's cell was directly above Mason's, and the men were given free run of their pod during much of the day. Mason's cell bordered the recreation yard and had a window through which it was possible to communicate with someone in the yard. And in a prison environment, where information about who has testified or is about to testify against a co-defendant circulates rather freely, it is not difficult to believe that Mason would have had knowledge of Clinkscale's status as an informer. See, e.g., Lewis v. Jeffers, 497 U.S. 764, 766 (1990) (describing how a defendant heard, while in jail, that an associate was providing the police information about him); United States v. Kibler, 667 F.2d 452, 453 (4th Cir. 1982) (noting that a defendant threatened a potential government witness with the warning that "snitches get hurt . . . even in jail"). Thus, even if Garrett had been able to impeach Clinkscale using the housing records, there is nothing approaching a substantial likelihood that the jury would have rejected Clinkscale's testimony to the extent necessary to produce a different outcome.

Furthermore, contrary to Mason's assertions, there was evidence of Mason's intent outside of Clinkscale's testimony. Mason's codefendant Latta testified at trial that Tank angrily claimed to Mason and Latta that Clinkscale was an informer as

11

they pursued Clinkscale from the Wal-Mart parking lot. There is no indication in the record that Clinkscale ever testified against anyone besides Ray, and in fact no other known motive for the violence against Clinkscale was suggested. The Wal-Mart surveillance cameras show Mason and Tank approaching Clinkscale in the store and then following him out of the parking lot, which could certainly have persuaded the jury that the men were seeking out Clinkscale for a reason. And although Latta claimed at trial not to know why the men were following and firing shots at Clinkscale, the government impeached him with his recorded statement from the morning of the shooting, in which he stated that Mason told him to shoot at Clinkscale and that Clinkscale had put Ray in prison. While this impeachment evidence was not admitted for its truth, it was sufficient to cast doubt on Latta's denial of any knowledge of Mason's intent.

In sum, the jury had ample reason to doubt that this was just a random act of violence. The evidence in the aggregate suggests that the three assailants were targeting Clinkscale in particular. And again, Mason has not offered a single alternative explanation for the shooting. He simply never put another possible motivation for his actions into play, thus giving the jury less reason to doubt the prosecution's case. In short, Mason has not established the prejudice that Strickland

12

requires, and the judgment of the district court must be affirmed.

AFFIRMED