2016 COA 70

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Martin VILLANUEVA, Defendant–Appellant.**

Court of Appeals No. 14CA1220

Colorado Court of Appeals, Div. V.

Announced May 5, 2016

538

Cynthia H. Coffman, Attorney General, Ethan Eliot Zweig, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee.

The Noble Law Firm, LLC, Antony Noble, Lakewood, Colorado; Ann P. Kaufman, P.C., Ann P. Kaufman, Taos, New Mexico, for Defendant-Appellant.

Opinion by JUDGE HARRIS

¶ 1 In September 2005, Martin Villanueva was arrested for the murder of Benjamin Garcia–Diaz. The police and prosecutors maintained that Villanueva shot Garcia–Diaz, who was a drug dealer in Villanueva's cocaine operation, because, in late 2004, Garcia–Diaz had been arrested, $30,000 worth of Villanueva's drugs had been seized, and Garcia–Diaz was poised to cooperate with police. In fact, when Garcia–Diaz had failed to appear for his arraignment in March 2005, his lawyer, Charles Elliot, told the prosecutor that he presumed his client was the victim of a "drug related" murder.

¶ 2 On September 27, 2005, Elliot entered his appearance as Villanueva's lawyer in the first degree murder case. Villanueva was convicted and sentenced to life in prison without the possibility of parole.

¶ 3 In his postconviction motion, the denial of which he is now appealing, Villanueva asserted that he was convicted in violation of his Sixth Amendment right to conflict-free counsel. He alleged, primarily, that Elliot had information that undercut the prosecution's theory of the case, but he could not present it because he had obtained the information during his representation of Garcia–Diaz.

¶ 4 After an evidentiary hearing, the district court denied the motion. It found that "Elliot had information stemming from his representation of Garcia–Diaz that could have affected his ability to represent the defendant," but concluded that the potential conflict did not adversely affect Elliot's performance.

¶ 5 While Villanueva's appeal of the district court's order was pending, the supreme court issued its decision in *West v. People,* 2015 CO 5, 341 P.3d 520, which clarified the standard for evaluating conflict of interest claims. In light of *West,* and as we explain below, we conclude that the district court erred in analyzing Villanueva's claims. We are unable to apply the correct standard as part of our de novo review, however, because the district court's order does not contain the necessary findings as to each part of the *West* standard. Accordingly, we vacate and remand that part of the district court's order addressing Villanueva's conflict of interest claims.

I. Background

A. The Trial Proceedings

¶ 6 In December 2004, Garcia–Diaz's wife called the police to report a domestic violence incident. When the police arrived, she consented to a search of the house, and police discovered approximately one and a half kilograms of cocaine, worth about $30,000. Garcia–Diaz was arrested on domestic violence-related charges and released on bond.

¶ 7 The prosecution later moved to add four felony charges related to the cocaine. Still, his lawyer, Elliot, told Garcia–Diaz that the case would likely be resolved as a misdemeanor. Because Garcia–Diaz's wife had stopped cooperating with police, Elliot advised Garcia–Diaz that the prosecution would have difficulty tying him to the drugs. The prosecution's motion to amend the charges was still pending at the time of Garcia–Diaz's murder.

¶ 8 Garcia–Diaz's case was set for arraignment on March 31, 2005, but he did not appear. He was reported missing on March 27, the same day his car was found abandoned and burned in Weld County.

¶ 9 Although Garcia–Diaz and Villanueva were close friends, Garcia–Diaz's family immediately suspected that Villanueva was involved in his disappearance. They pieced together Garcia–Diaz's last known whereabouts and learned that he was with Villanueva and another friend, Mario Rivera, the night before he went missing. When the

family contacted Rivera, he told them that Villanueva, seemingly unprovoked, had shot Garcia–Diaz in the head. The family confronted Villanueva and surreptitiously taped his response. During this time, the family contacted Elliot to discuss their suspicions.

¶ 10 Rivera reported the murder to the police and, within a few days of Garcia–Diaz's disappearance, Villanueva was interviewed by the police. The interview was cut short, though, when Villanueva told the police that he was represented by counsel, Charles Elliot.

¶ 11 Elliot had represented Villanueva in three previous cases and, after being confronted by Garcia–Diaz's family and questioned by the police, Villanueva sought advice from Elliot. Elliot told him not to speak to the police.

¶ 12 In September, Garcia–Diaz's body was discovered and Villanueva was arrested on a charge of first degree murder. Elliot entered his appearance in the case shortly thereafter.

¶ 13 He advised Villanueva that, because he had represented Garcia–Diaz in the drug case, the prosecution might move to disqualify him, but he told Villanueva that he would try to secure an agreement from the prosecutor that would allow him to continue the representation. Elliot met with the prosecutor, who ultimately agreed not to seek disqualification. As part of their agreement, Elliot and the prosecutor decided they would not reveal the fact of Elliot's prior representation of Garcia–Diaz to the jury. Neither this agreement nor the fact that Elliot had represented Garcia–Diaz was disclosed to the court.

¶ 14 The case proceeded to trial in 2006. The prosecution laid out its theory of the case in its opening statement, detailing the seizure of cocaine from Garcia–Diaz's house and explaining that, once charges were filed, Garcia–Diaz was "in a posture to turn in his supplier." The prosecutor told the jury that Villanueva shot Garcia–Diaz at a critical time—four days before Garcia–Diaz's arraignment. A police officer later offered expert testimony that cooperation deals are typically struck at the time of arraignment.

¶ 15 Numerous other witnesses testified about the underlying facts of Garcia–Diaz's criminal case and Villanueva's motive to murder him: two police officers testified about the search of Garcia–Diaz's house and the seizure of cocaine; a crime lab technician described the purity of the cocaine; and the expert officer opined that the amount of drugs recovered was "significant," assigned a dollar value to the cocaine, and said that dealers were often given incentives to identify their suppliers. According to Garcia–Diaz's brother, Garcia–Diaz told Villanueva that if he were charged with a drug offense, he would turn on Villanueva, and, in response, Villanueva threatened to "put a bullet in his head." Garcia–Diaz's sister testified that Villanueva had threatened to kill Garcia–Diaz or his wife because she had allowed the police to search the house and thereby discover the cocaine. A cousin testified that Villanueva was worried that his fingerprints were on the packages of cocaine seized from the house. Rivera, the eyewitness, also corroborated the prosecution's theory of the case. He testified that Villanueva supplied Garcia–Diaz with the cocaine and that, after the drugs were seized by police, Garcia–Diaz told Rivera that he was in debt to Villanueva.

¶ 16 The prosecution also suggested that Villanueva was angry because Garcia–Diaz was having an affair with his wife, but there was no direct evidence of that and Villanueva's wife denied it.

¶ 17 In closing argument, the prosecutor spelled out the motive for the jury:

We don't have to prove motive to you.... But as human beings, you want to know, why would this happen? Why would somebody ... kill one of his best friends?

. . .

It all starts in December 2004, [when] one and a half kilos of cocaine are found in the home of [Garcia–Diaz].

Garcia–Diaz's arraignment date was approaching, the prosecutor reminded the jury, and that was the time when he "ha[d] to make some decisions." The prosecutor referenced Villanueva's surreptitiously taped statements to Garcia–Diaz's family, in which

he acknowledged having spoken with "Garcia–Diaz's lawyer." According to the prosecutor, Villanueva knew, presumably from those communications, that Garcia–Diaz was at a crossroad in his criminal case, and that "the only way he [was] going to get out of this case ... [was] by going higher up the ladder, [to] his friend, Martin Villanueva."

¶ 18 Elliot did not attempt to rebut the prosecution's theory that Villanueva had killed Garcia–Diaz to prevent him from "snitching." But, as it turned out, Elliot knew that Garcia–Diaz had made no overtures to police or prosecutors about cooperating against Villanueva. As of the date of Garcia–Diaz's arraignment, Elliot had not had any discussions with prosecutors about a cooperation agreement or a potential plea deal. To the contrary, Elliot had advised Garcia–Diaz that the drug case "would go away."

¶ 19 Villanueva was convicted of first degree murder and sentenced to life in prison without the possibility of parole.

### B. The Postconviction Proceedings

¶ 20 After his conviction was affirmed on direct appeal, *People v. Villanueva*, (Colo. App. No. 07CA0858, 2009 WL 1091418, Apr. 23, 2009) (not published pursuant to C.A.R. 35(f)), Villanueva filed a Crim. P. 35(c) motion alleging that he had received ineffective assistance of counsel because Elliot had a conflict of interest that adversely affected his performance at trial.

¶ 21 The crux of his claim was that Elliot knew that the prosecutor's theory of the case was built on a false premise but he could neither use the information he had nor attempt to obtain it from an independent source, because he had initially gained the information through his representation of Garcia–Diaz. An unconflicted lawyer could have investigated whether Garcia–Diaz was actually poised to "snitch," but Elliot could not, Villanueva argued, because he had an ethical obligation under Colorado Rule of Professional Conduct 1.6 to keep confidential anything he knew about Garcia–Diaz. And, Villanueva alleged, an unconflicted lawyer would have specifically advised him of the potential pitfalls of sharing a lawyer with the victim, particularly where the victim's case was so intertwined with his own. But, there was nothing in the record to establish that Villanueva was specifically advised of any potential conflict by his lawyer or the court, or that he formally waived any such potential conflict.

¶ 22 Villanueva also contended that, unrelated to the conflict, he received ineffective assistance of counsel because Elliot failed to investigate and discover certain evidence that could have been helpful to his defense. In addition, he alleged ineffective assistance of appellate counsel for failing to bring the conflict of interest claim on direct appeal.

¶ 23 The district court denied the postconviction motion, finding that, although there was a potential conflict, it never ripened into an actual conflict of interest. The court ruled that Elliot had made reasonable strategic choices unaffected by the potential conflict. It concluded that Elliot was not under any obligation to expose the flaws in the prosecution's theory of the case because rebuttal of that evidence would not have affected the outcome of the trial. The court also rejected Villanueva's non-conflict-related ineffective assistance of counsel claims against Elliot and appellate counsel.

### C. Claims on Appeal

¶ 24 On appeal, Villanueva argues that the district court erred in analyzing his claims. He first contends that the court improperly assessed whether the strategy Elliot *did* pursue could be viewed as reasonable, instead of determining whether the alternative strategy that Elliot *did not* pursue was objectively reasonable.

¶ 25 Next, Villanueva asserts that the court erred in rejecting his alternative strategy of undercutting the prosecution's theory of the case on the ground that debunking the prosecution's motive theory would not have affected the outcome of the trial. According to Villanueva, motive was critical to the prosecution's case. The motive theory made what otherwise appeared to be an unprovoked and inexplicable crime more understandable to the jury. And, by undercutting the evidence of the motive, counsel would

have undercut the credibility of the eyewitness, who corroborated the prosecution's theory by suggesting that Garcia–Diaz's drug case provided a motive for the murder.

¶ 26 Finally, Villanueva argues that the district court erred by relying on Elliot's self-serving statements that his strategic choices were not affected by a potential conflict, instead of determining whether the reasonable alternative strategy was inherently in conflict with Elliot's ethical duties to Garcia–Diaz, or was not pursued because of those duties.

¶ 27 Villanueva also appeals the district court's denial of his other claims of ineffective assistance against both Elliot and appellate counsel.

## II.   Legal Principles

¶ 28 In reviewing the denial of a Crim. P. 35(c) motion after a hearing, we defer to the postconviction court's findings of fact if they are supported by the evidence, but review conclusions of law de novo. *West,* ¶ 11.

¶ 29 The Sixth Amendment guarantees a criminal defendant's right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To obtain relief on an ineffective assistance of counsel claim, a defendant must generally satisfy the two-prong test adopted by the United States Supreme Court in *Strickland, id.* at 690–91, 104 S.Ct. 2052, under which a defendant must establish: (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Hagos v. People,* 2012 CO 63, ¶ 17, 288 P.3d 116. This standard is highly deferential and carries the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Ardolino v. People,* 69 P.3d 73, 76 (Colo.2003). And to show prejudice under *Strickland,* the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also People v. Cole,* 775 P.2d 551, 554 (Colo.1989).

¶ 30 The right to effective assistance of counsel includes the right to conflict-free representation. *West,* ¶ 15. However, when a defendant's ineffective assistance claim is premised on the existence of a conflict of interest, we assess this claim under the standards outlined in *Cuyler v. Sullivan,* 446 U.S. 335, 349, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and not *Strickland.* Under *Sullivan,* a defendant must demonstrate that his counsel labored under a conflict of interest that adversely affected his lawyer's performance. *Id.* at 348, 100 S.Ct. 1708. Once a defendant makes this showing, prejudice is presumed and nothing more is required for relief. *Id.* at 349–50, 100 S.Ct. 1708. The adverse effect inquiry thus requires a lesser showing than *Strickland* prejudice. *West,* ¶ 24 ("The *Sullivan* exception applies 'needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.'" (quoting *Mickens v. Taylor,* 535 U.S. 162, 176, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002))).

### III.   Conflict of Interest Claims

#### A.   Standard for Analyzing Conflict of Interest Claims

¶ 31 In *West,* the supreme court clarified the elements of a conflict of interest claim under *Sullivan,* and adopted a standard for analyzing those elements. First, the court made clear that a defendant alleging ineffective assistance of counsel based on a conflict of interest must show (1) that counsel had a conflict of interest (2) that adversely affected the representation. *West,* ¶ 28. Prior case law in Colorado had suggested that a defendant who established a conflict of interest was not required to demonstrate a separate adverse effect. *See, e.g., People v. Castro,* 657 P.2d 932, 944–45 (Colo.1983). The court rejected this standard as inconsistent with Supreme Court case law. *West,* ¶ 2 (overruling *Castro* ).

¶ 32 Next, the court clarified the standard for evaluating the *Sullivan* elements. As for the first element of the test, the court explained that a conflict of interest means a potential conflict. *Id.* at ¶¶ 40, 42 (defining potential conflict as "a situation inherently

conducive to and productive of divided loyalties") (citation omitted).[1]

¶ 33 With regard to the adverse effect element, the court adopted the Fourth Circuit's tripartite test articulated in *United States v. Nicholson*, 611 F.3d 191 (4th Cir. 2010). Under this test, to show an adverse effect, a defendant must (1) identify a plausible alternative defense strategy or tactic that trial counsel could have pursued; (2) show that the alternative strategy or tactic was objectively reasonable under the facts known to counsel at the time; and (3) establish that counsel's failure to pursue the strategy or tactic was linked to the actual conflict. *West*, ¶ 3; *see also Nicholson*, 611 F.3d. at 197.

¶ 34 Under the first prong of the adverse effect analysis, the defendant must demonstrate that "counsel possessed sufficient information to merit considering an alternative strategy or tactic" that was "obviously in the defendant's interest." *West*, ¶ 58.

¶ 35 Once the defendant has identified an unpursued alternative strategy, he must show that that the alternative was objectively reasonable under the facts known to counsel at the time of the decision. *Id.* at ¶ 59. This inquiry focuses on case-specific factors, including whether there was evidentiary support for the alternative, and does not consider trial counsel's subjective assessment. *Id.* at ¶¶ 59–60; *see also Nicholson*, 611 F.3d at 211 (finding alternative strategy objectively reasonable because there was ample, undisputed evidence to support it). An alternative strategy is not reasonable if it "would have proved unwise, illogical, or otherwise undesirable under the factual circumstances." *West*, ¶ 55. In other words, proffered alternatives are not reasonable when they would have been detrimental to the defense. *See, e.g., Noe v. United States*, 601 F.3d 784, 790–91 (8th Cir. 2010) (plausible alternative was not objectively reasonable because it would have undermined the credibility of defense witnesses); *Pegg v. United*

*States*, 253 F.3d 1274, 1278 (11th Cir. 2001) (There was no adverse effect when, "[a]lthough there was a clear alternative to the chosen defense strategy," the alternative was not reasonable because it "would have been devastating" to defendant's case.).

¶ 36 The supreme court expressly warned that the objectively reasonable analysis should not be "deferential to counsel's subjective assessment of his representation." *West*, ¶ 51. Noting that attorneys "systematically understate both the existence of conflicts and their deleterious effects," the court concluded that a test that relied largely on an attorney's interpretations of his decisions amid the conflict would make it too difficult for a defendant to prove an adverse effect. *Id.* (citation omitted). Thus, the court adopted an objective test in order to "eliminat[e] a defendant's forced reliance on the attorney's subjective assessment of his representation." *Id.* at ¶ 54. This test does not "permit the court to view the lawyer's performance under the 'highly deferential' standard spelled out in *Strickland*." *Id.* at ¶ 59 (quoting *Nicholson*, 611 F.3d at 207).

¶ 37 The third prong can be proven either by showing that the alternative strategy or tactic was inherently in conflict with counsel's other loyalties or interests or by showing that the alternative strategy or tactic was not undertaken due to those other loyalties or interests. *Id.* at ¶ 61. In determining whether the alternative strategy was inherently in conflict with counsel's other loyalties, "counsel's subjective belief that he forewent the alternative strategy for reasons unrelated to the conflict" is irrelevant. *Id.* at ¶ 62.

¶ 38 An alternative strategy is inherently in conflict with an attorney's other duties or loyalties when the strategy and duties are inconsistent with each other. *Id.* Under this analysis, if the attorney could not pursue the alternative strategy without com-

---

1. Some cases, including *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), refer to an "actual conflict of interest," *id.* at 350, 100 S.Ct. 1708 (upon a showing of an "actual conflict of interest," prejudice is presumed), but an "actual conflict" is simply shorthand for a "conflict that affected counsel's performance," *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

promising his other duties, there is an inherent conflict.

¶ 39 *Nicholson* provides an instructive example of an inherent conflict. There, the defendant alleged that his attorney had a conflict of interest because he simultaneously represented, in another matter, a client who had threatened to kill the defendant. Nicholson was charged with unlawful possession of a firearm, but he alleged that he only possessed the gun to protect himself from threats by the other client. Nicholson's proposed alternative strategy was that, during sentencing, his counsel should have moved for a downward departure based on self-defense. However, to make this argument, the lawyer would have been required to present evidence that his other client had threatened to kill Nicholson and had actually killed Nicholson's stepfather. The court found that the alternative strategy was inherently in conflict with the lawyer's duties to his other client because, if counsel moved for a downward departure, he would act contrary to the interests of his other client; but if he declined to request a departure, as he did, he would act contrary to Nicholson's interests. Thus, the clients' interests were "in total opposition," leaving counsel in the "untenable position" of having to place one client's interests above the other's. *Nicholson*, 611 F.3d at 215.[2]

¶ 40 If the alternative strategy or tactic does not present an inherent conflict, a defendant may still prove that the failure to pursue the alternative strategy was due to the conflict by pointing to record evidence that strongly indicates that this failure resulted from a "struggle to serve two masters." *West*, ¶ 63 (quoting *Sullivan*, 446 U.S. at 349, 100 S.Ct. 1708). However, a defendant need not demonstrate "unequivocal proof of a link." *Id.*

### B. Application of the Standard to Villanueva's Claims

¶ 41 Having established the standards we must apply to conflict of interest claims, we now turn to Villanueva's contentions.

#### 1. Failure to Advise and Invalid Waiver

¶ 42 In his briefs, Villanueva contended that he was entitled to a new trial because he was not sufficiently advised regarding the conflict. At oral argument, his counsel maintained that, contrary to certain findings of the district court, Villanueva had not waived the conflict, but counsel conceded that the absence of a sufficient advisement and waiver does not give rise to an automatic reversal of the conviction. We agree with both points made at oral argument.

¶ 43 A defendant may waive the right to conflict-free counsel, "even though by such waiver the defendant in all probability will receive representation which is less effective than the representation which could be provided by conflict-free counsel." *Rodriguez v. Dist. Court*, 719 P.2d 699, 706 (Colo. 1986); *see also* Colo. RPC 1.7 & 1.9 (discussing rules for resolving conflicts of interest involving current and former clients)[3] A defendant who validly waives the right to conflict-free counsel cannot later bring a claim of ineffective assistance of counsel due to a conflict of interest. *Dunlap v. People*, 173 P.3d 1054, 1070 (Colo.2007).

¶ 44 But before a waiver can be deemed valid, the defendant must be fully advised of the existing or potential conflict:

Once a potential conflict of interest becomes reasonably apparent, the attorney

---

**2.** To demonstrate an alternative strategy that would not be inherently in conflict with counsel's duties to another client, the *Nicholson* court considered a different hypothetical alternative strategy—a downward departure based on Nicholson's poor health. Because, even if there was a conflict, this reasonable alternative strategy was completely unrelated to it, the Fourth Circuit explained that the failure pursue it would not be inherently linked to the conflict. *United States v. Nicholson*, 611 F.3d 191, 214–15 (4th Cir. 2010).

**3.** Not all conflicts are waivable. If a defendant's choice to proceed with conflicted counsel undermines the integrity of the criminal justice system—because it affects the perception of the fundamental fairness and impartiality of the proceedings—the district court may order disqualification despite a knowing waiver by the defendant. *Rodriguez v. Dist. Court*, 719 P.2d 699, 706 (Colo.1986); *see also* Colo. RPC 1.7 cmt. 2 (requiring lawyer to determine whether conflict is waivable in the first instance).

should inform the client of the nature of the conflict and, in plain terms, describe the specific ways in which the conflict may affect the attorney's ability to effectively represent the defendant at various stages of the pending litigation. The defense attorney then should place on record the potential conflict of interest and further advise the court that as complete a disclosure as possible has been made to the defendant.... If the court, upon inquiry of the defendant, is satisfied that he understandingly (voluntarily, knowingly and intelligently) waives all conflicts that are reasonably foreseeable under the circumstances, then it may accept the waiver, even though it views the defendant's decision as an improvident one.

*Castro*, 657 P.2d at 946 n. 10 (citations omitted), *overruled on other grounds by West; see also People v. Harlan*, 54 P.3d 871, 879 (Colo.2002).

¶ 45 We agree with Villanueva that the record does not support a finding that he knowingly, voluntarily, and intelligently waived the potential conflict. Rather, the record suggests that he was not fully advised of the possible consequences of the conflict. For example, although Elliot testified that he discussed the issue "at length" with Villanueva, the record demonstrates that these discussions focused on the possible ramifications of Elliot being disqualified; it does not appear that he advised Villanueva of the specific ways in which the defense might be limited by his prior representation of Garcia–Diaz. *See People v. Curren*, 228 P.3d 253, 258 (Colo.App.2009) ("Once counsel is aware of an actual or potential conflict of interest, counsel must ... describe in plain terms the specific ways in which the conflict may affect counsel's ability to effectively represent the defendant."). Indeed, Elliot testified that he primarily discussed with Villanueva "the fact that [he] did not think there was a conflict

nor anything out there that would inhibit anything [he] intended to do at trial."

¶ 46 Nor did either party bring the conflict to the attention of the trial court, even though both Elliot and the prosecutors were aware that the prior representation was likely to present problems at trial. Instead of disclosing those problems to the trial court, Elliot and the prosecutors decided to resolve the issues through a confidential agreement to keep from the jury the fact of Elliot's prior representation of the victim. The failure to raise the potential conflict precluded the trial court from performing its independent duty to inquire into and advise the defendant about the conflict. *See Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *People v. Edebohls*, 944 P.2d 552, 556 (Colo.App.1996).

¶ 47 We also note that Elliot did not produce a written waiver. Colo. RPC 1.7(b)(4) (If a conflict of interest exists, the lawyer can represent the client if "each affected client gives informed consent, confirmed in writing."); *see also People v. Maestas*, 199 P.3d 713, 717–18 (Colo.2009) (the defendant validly waived a conflict where the defendant was appointed independent counsel to discuss the waiver and the district court determined that the written waiver was voluntary and knowing).

¶ 48 However, as Villanueva now concedes, the absence of a valid waiver does not, by itself, entitle him to relief. Instead, he must show that the insufficient advisement and the concomitant failure to validly waive the conflict mattered—that is, that he was represented by a lawyer who labored under a conflict of interest that adversely affected his performance. *See Curren*, 228 P.3d at 259–60 (after concluding that the defendant did not waive conflict, the court went on to consider whether the conflict had an adverse effect on counsel's performance);[4] *cf. West*, ¶¶ 39–44 (remanding for consideration of adverse effect even though the defendant was

---

4. *People v. Curren*, 228 P.3d 253, 259–60 (Colo. App.2009), identifies the confusion in Colorado courts before *West v. People*, 2015 CO 5, 341 P.3d 520. There, a division of this court noted that, under *People v. Castro*, 657 P.2d 932 (Colo.1983), a showing of an adverse effect would not be required once the court found a conflict of interest that was not waived. However, the division also recognized that more recent cases required a showing of an adverse effect. As *West* has now explicitly overruled *Castro* in this regard, it is clear that even without a valid waiver, a defendant must demonstrate an adverse effect to prevail. *West*, ¶¶ 28–29.

not advised of the conflict); *accord United States v. Nicholson*, 475 F.3d 241, 251–52 (4th Cir. 2007) (same); *see also Mickens*, 535 U.S. at 174, 122 S.Ct. 1237 (despite not being advised of the conflict, conflict of interest claim failed because defendant did not demonstrate an adverse effect on his counsel's performance). The failure to validly waive the conflict allows Villanueva to bring a conflict of interest claim, but it does not change the proof necessary to prevail on the claim.

¶ 49 Accordingly, we turn to the substance of his conflict of interest claim.

### 2. Failure to Challenge Prosecution's Theory of the Case

¶ 50 Villanueva contends that the district court erred in analyzing his claim that Elliot was ineffective for failing to rebut the prosecution's theory of the case. Specifically, Villanueva argues that the court applied an incorrect standard to reach three key conclusions: (1) Villanueva did not establish an actual conflict; (2) Elliot's chosen defense strategy was reasonable and, therefore, Elliot was not ineffective for declining to pursue an alternative strategy; and (3) there was no link between the proffered alternative strategy and the conflict.

¶ 51 Regarding the first element of the *Sullivan* test, the district court found that Villanueva had failed to establish the requisite conflict of interest. The court determined that, although there was a potential conflict, it never ripened into an actual conflict of interest. Under *West*, however, a defendant need only establish a potential conflict to satisfy this element. *West*, ¶ 44; *see also id.* at ¶ 40 (A potential conflict arises where the situation is "inherently conducive to and productive of divided loyalties."). The district court found that "Elliot had information stemming from his representation of Garcia–Diaz that could have affected his ability to represent the Defendant," resulting in a "potential" conflict. The evidence amply supports the district court's finding. *See id.* at ¶¶ 40–41 (potential conflict existed where the defendant's lawyer had access to confidential information about a prosecution witness because lawyer's office represented witness in unrelated case).

¶ 52 Though it reasoned that Villanueva had failed to establish the necessary "actual conflict," the court continued its analysis, considering whether, assuming a conflict, the conflict adversely affected Elliot's performance. But without the benefit of *West*, the court focused on the strategy Elliott did pursue, and not, as *West* requires, the plausible alternative that he failed to pursue. *Id.* at ¶ 57.

¶ 53 For example, in finding no adverse effect from the potential conflict, the district court determined that "trial counsel asserted reasonable defenses under the circumstances and challenged the prosecution's case in a number of ways." But, under *West*, the reasonableness of the selected defense strategy is irrelevant; rather, the proper inquiry is whether the alternative strategy or tactic raised by the defendant would have been objectively reasonable under the circumstances. *Id.*

¶ 54 Because the *Nicholson* test had not yet been adopted in Colorado, the court never considered or made any findings regarding whether, under the facts known to Elliot at the time of the representation, it would have been objectively reasonable to challenge the prosecution's motive evidence. Instead of analyzing this proffered alternative strategy, the court instead analyzed Elliot's actual strategy of attacking the eyewitness testimony. The court did not explain, however, why challenging the credibility of the eyewitness and challenging the evidentiary basis of the prosecution's theory of the case were mutually exclusive strategies, such that pursuit of the latter strategy would have been objectively unreasonable.

¶ 55 As Villanueva notes, attacking the theory of motive could have also impugned the credibility of the eyewitness. Without a plausible explanation for Villanueva's sudden and seemingly irrational act, the eyewitness' testimony may have been less credible. According to Rivera, in the hours leading up to the shooting, Villanueva and Garcia–Diaz had been out with a group of friends drinking at a bar. The group parked in front of Villanueva's home and Villanueva told Garcia–Diaz to get out of the car. When Garcia–

Diaz resisted, saying that he had to get home, Villanueva shot him in the head. The prosecution's theory of the case made the murder seem more rational and, as a result, the eyewitness more credible. *See Masters v. People,* 58 P.3d 979, 999 (Colo.2002) (Motive evidence was important to "explain an otherwise inexplicable act of random violence."); *People v. Cousins,* 181 P.3d 365, 372 (Colo.App.2007); *see also People v. Roldan,* 35 Cal.4th 646, 27 Cal.Rptr.3d 360, 110 P.3d 289, 329 (2005) ("[E]vidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable."), *overruling on other grounds recognized by People v. Duenas,* 55 Cal.4th 1, 144 Cal.Rptr.3d 820, 281 P.3d 887 (2012); *Lazo v. United States,* 930 A.2d 183, 185 (D.C.2007) (motive evidence was particularly important for an otherwise unexplained stabbing).

¶ 56 Because it did not have the benefit of *West*'s instructions, the district court did not making any findings as to why attacking the motive would be objectively unreasonable or how this strategy could have been "unwise, illogical, or otherwise undesirable." *West,* ¶ 55.[5]

¶ 57 The court also rejected Villanueva's claim that the failure to challenge the prosecution's motive was an adverse effect because this alternative strategy was not "significant," and attacking the motive was not "a determinative issue," as the trial hinged on the credibility of the eyewitness testimony. But an alternative strategy need not be outcome determinative to support a conflict of interest claim. *See Sullivan,* 446 U.S. at 349–50, 100 S.Ct. 1708; *see also West,* ¶¶ 24, 33–34 (noting that *Strickland* prejudice is not required for conflict of interest claims); *Nicholson,* 611 F.3d at 205. Indeed, a defendant "need not show that the defense would necessarily have been successful" had the alternative strategy or tactic been used; "rather[,] he only need prove that the alternative 'possessed sufficient substance to be a viable alternative.'" *Freund*

v. *Butterworth,* 165 F.3d 839, 860 (11th Cir. 1999) (quoting *United States v. Fahey,* 769 F.2d 829, 836 (1st Cir. 1985)).

¶ 58 Moreover, we agree with Villanueva that motive, although not an element of first degree murder, can be material, and "the absence of apparent motive may make proof of the essential elements less persuasive." *Masters,* 58 P.3d at 992 (quoting *People v. Phillips,* 122 Cal.App.3d 69, 175 Cal.Rptr. 703, 712 (1981)); *see also State v. Wargo,* 255 Conn. 113, 763 A.2d 1, 17 n. 24 (2000) ("Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant.... [W]ithout a disclosed motive[,] the guilt of the accused [c]ould be clouded by a reasonable doubt." (quoting *State v. Harris,* 182 Conn. 220, 438 A.2d 38, 41 (1980))). Indeed, motive evidence can be "directly relevant to proving whether defendant committed the actus reus of the crime." *Cousins,* 181 P.3d at 372; *see also Masters,* 58 P.3d at 997; *cf. Roldan,* 27 Cal.Rptr.3d 360, 110 P.3d at 329 ("[M]otive is material as evidence tending to refute or support the presumption of innocence." (quoting *People v. Scheer,* 68 Cal. App.4th 1009, 80 Cal.Rptr.2d 676, 680 (1998))).

¶ 59 By rejecting this alternative strategy because it was not determinative, the district court detoured from the *Sullivan* standard and veered into a *Strickland* analysis. *Strickland* prejudice, which requires a reasonable probability that the outcome of the trial would have been different, does not apply to conflict of interest claims. *Sullivan,* 446 U.S. at 349–50, 100 S.Ct. 1708. Under *West,* the defendant must prove an adverse effect on counsel's representation, not an adverse effect on the verdict. *West,* ¶¶ 33–34. On remand, therefore, the district court should determine whether this strategy was objectively reasonable, and not whether it was outcome determinative.

---

5. At the hearing, Elliot's only justification for not attacking the prosecution's primary theory of the motive was that the prosecution had no evidentiary support for it and that the prosecution's pursuit of multiple motives "inured to their bene-

fit." But, if Elliot thought that the prosecution had no evidentiary support for its primary theory of the case, it is difficult to understand why he did not point that out to the jury:

¶ 60 Finally, in determining whether Elliot's failure to pursue the alternative strategy or tactic was linked to the actual conflict, the district court deferred to counsel's strategic decisions and post-hoc testimony. The court credited Elliot's testimony that his decisions were not due to the conflict, and therefore determined that his defense resulted from "a series of strategic choices" unrelated to his representation of Garcia–Diaz. While this analysis may be sufficient under *Strickland*'s highly deferential standard, it does not comport with the standards laid out in *West*. The court did not consider, as *West* instructs, whether the failure to pursue the alternative strategy was inherently in conflict with his duties to Garcia–Diaz. *Id.* at ¶¶ 61–62. In this inquiry, "it is unnecessary—and even inappropriate—to accept and consider evidence of any benign motives for the lawyer's tactics, including the lawyer's testimony about his subjective state of mind." *Nicholson*, 611 F.3d at 213; *see also West*, ¶ 62.

¶ 61 Thus, on remand, the court should consider whether Elliot's duties to Garcia–Diaz were inherently in conflict with the alternative strategy of challenging the prosecution's theory that Garcia–Diaz was about to "snitch" on Villanueva. In doing so, the district court should consider whether rebutting this theory of motive, whether by presenting affirmative evidence or vigorously cross-examining witnesses, would have been inconsistent with Elliot's duties of confidentiality to Garcia–Diaz.[6]

¶ 62 In this analysis, it would be inappropriate for the court to consider the agreement between Elliot and the prosecutors to conceal the fact of Elliot's prior representation of Garcia–Diaz as a circumstance unrelated to the conflict. In its denial of Villanueva's motion, the district court found that Elliot's failure to attack the motive resulted not from the conflict but from the agreement; according to the court, Elliot could not challenge the prosecution's theory of the case without violating his agreement to keep secret the fact of the prior representation. But the agreement was a direct product of the conflict—Elliot sought an agreement from the prosecution precisely because there was a potential conflict, and he thought that the agreement would help neutralize it. On remand, the district court should consider the agreement in its analysis of whether there was a link between the potential conflict and Elliot's failure to attack the motive.

### 3. Failure to Assist Pre–Arrest

¶ 63 Villanueva also contends that, due to the conflict of interest with Garcia–Diaz, Elliot failed to conduct any pre-arrest investigation and this adversely affected his representation. However, to assert a claim based on the Sixth Amendment's right to counsel, that right must have attached at the time of the disputed conduct. *People v. Romero*, 2015 COA 7, ¶¶ 14–15, —— P.3d ——. The Sixth Amendment right to counsel does not attach until the initiation of "adversary judicial proceedings," which occurs after a defendant is charged with a crime. *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *People v. Vigoa*, 841 P.2d 311, 315 (Colo.1992); *Romero*, ¶ 14; *People v. Palmer*, 888 P.2d 348, 351 (Colo.App.1994). Thus, because this claim is based on Elliot's conduct before Villanueva was charged, this conflict of interest claim fails. *See Romero*, ¶¶ 14–15 (ineffective assistance of counsel claim based on pre-indictment conduct failed because Sixth Amendment right had not yet attached).

### IV. *Strickland* Claims

¶ 64 In addition to his conflict of interest claims, Villanueva also contends that, regardless of the conflict, he received ineffective assistance of counsel because Elliot failed to adequately investigate his case. He argues that Elliot failed to (1) interview the eyewitness' roommate; (2) investigate cell phone

---

6. Villanueva's ethics expert testified at the postconviction hearing that an attorney's duties of confidentiality extend beyond attorney-client privilege. He opined that an attorney cannot reveal any information related to the representation of a client, whatever its source. *See* Colo. RPC 1.6(a) & cmt. 3 ("The confidentiality rule ... applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.").

tower records; and (3) investigate real estate owned by the Garcia–Diaz family. Villanueva further asserts that he received ineffective assistance from appellate counsel because counsel failed to raise the conflict issue on direct appeal. We reject all of Villanueva's *Strickland* claims and affirm this part of the district court's order.

¶ 65 To establish ineffective assistance of counsel under *Strickland*, a defendant must demonstrate both deficient performance by counsel and prejudice. A lawyer's performance is deficient when it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052; *Ardolino*, 69 P.3d at 76. To show prejudice, a defendant must demonstrate a reasonable probability that without the deficiency, the result of the proceeding would have been different. *Ardolino*, 69 P.3d at 76.

¶ 66 If a court determines that a defendant has failed to prove either prong of the *Strickland* analysis, it may deny an ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052; *People v. Washington*, 2014 COA 41, ¶ 20, 345 P.3d 950.

¶ 67 Each of Villanueva's *Strickland* claims fails on the prejudice prong. At this stage in the proceedings, Villanueva must do more than simply allege that other evidence could have aided his defense; he must identify the evidence and demonstrate that it would have advanced his defense. *See People v. Chambers*, 900 P.2d 1249, 1252 (Colo.App.1994).

¶ 68 Villanueva says that Elliot was ineffective for failing to interview Rivera's roommate. But he does not offer any evidence that the roommate would have provided helpful testimony. Instead, he merely asserts that "the roommate could have provided evidence that would have established reasonable doubt that Villanueva was the shooter." That kind of conclusory allegation is insufficient to establish prejudice under *Strickland*. *Chambers*, 900 P.2d at 1252 (Without demonstrating potential witnesses' "willingness to testify (or their amenability to process), and the substance, credibility, or admissibility of their testimony," a defendant cannot demonstrate that counsel's failure to investigate resulted in any prejudice.); *see*

*also People v. Pendleton*, 2015 COA 154, ¶ 34, 374 P.3d 509 ("[T]he mere possibility that additional investigation would have revealed useful information does not establish ineffective assistance.").

¶ 69 Villanueva contends that cell phone tower information could have been used to show that he was not, as the prosecution maintained, in Weld County disposing of Garcia–Diaz's body and his car. But he does not offer any support for the allegation. There is no evidence that cell phone tower records would have placed him elsewhere that morning. Therefore, Villanueva has failed to establish any prejudice from the absence of the records. *Pendleton*, ¶ 34; *Chambers*, 900 P.2d at 1252.

¶ 70 Villanueva argues that Elliot should have investigated the Garcia–Diaz family's high-value real estate holdings so that he could have refuted the prosecution's theory that he killed Garcia–Diaz over a paltry $30,000 debt. But showing that other members of the Garcia–Diaz family had significant assets would not have established Garcia–Diaz's ability to repay the debt. In any event, at trial, Elliot attacked the theory more directly, eliciting testimony that Garcia–Diaz was making $18,000 a week selling cocaine. Thus, Villanueva has failed to establish a reasonable probability that the result of the trial would have been different had this evidence been introduced. *See People v. Tackett*, 742 P.2d 957, 960 (Colo.App.1987) (failure to present "inconsequential" evidence did not establish prejudice under *Strickland*); *cf. Washington*, ¶ 35 (counsel not ineffective when evidence not presented would have been cumulative).

¶ 71 Additionally, Villanueva contends that he received ineffective assistance from appellate counsel because counsel failed to raise the conflict of interest claim on direct appeal. But this failure does not satisfy either the deficient performance or the prejudice prong of the *Strickland* test because a defendant is not required to assert an ineffective assistance of counsel claim on direct appeal. *See* Crim. P. 35(c)(3)(VIII) ("[T]he court shall not deny a postconviction claim of

ineffective assistance of trial counsel on the ground that all or part of the claim could have been raised on direct appeal."); *see also Ardolino*, 69 P.3d at 77 ("[D]efendants have regularly been discouraged from attempting to litigate their counsels' effectiveness on direct appeal.").

### V. Conclusion

¶ 72 We affirm that part of the district court's order resolving Villanueva's claims under *Strickland*. We vacate that part of the district court's order resolving Villanueva's conflict of interest claims (except the pre-arrest claims), and we remand with directions that the court make additional findings of fact and reconsider the conflict of

interest issue under the appropriate legal standard. The district court may, at its discretion, enter its ruling based on the current evidentiary record, or it may permit the parties to supplement the record by offering additional evidence.

JUDGE STERNBERG * and JUDGE VOGT * concur.

---

\* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S. 2015.